EXXEL/ATMOS, INC., Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 93–1108.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 11, 1994.

Decided July 15, 1994.

Francis J. Connell, III, Philadelphia, PA, argued the cause and filed the briefs, for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, DC, argued the cause, for respondent. With him on the brief were Linda Sher, Acting Associate Gen. Counsel, N.L.R.B., Aileen A. Armstrong, Deputy Associate Gen. Counsel, and David Seid, Attorney, N.L.R.B., Washington, DC.

Before: MIKVA, Chief Judge, BUCKLEY and RANDOLPH, Circuit Judges.

Opinion of the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Exxel/Atmos, Inc. ("Exxel" or "Company") seeks review of an order of the National Labor Relations Board ("NLRB" or Board") finding that it committed unfair labor practices against District 9 of the United Steelworkers of America, AFL–CIO ("Union"). Adopting the findings of an Administrative Law Judge ("ALJ"), the Board determined that Exxel's President refused to bargain with, and withdrew recognition from, the duly recognized Union in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1) and (5). The Board issued an order requiring the company to cease and desist from all unfair labor practices and compelling it to bargain with the Union at the latter's request. We uphold the Board's unfair labor practice finding and its decision not to sponsor an election. However, we remand the case to allow the Board to explain why an affirmative bargaining order, as opposed to the cease and desist order alone, is the appropriate remedy for Exxel's refusal to bargain with the Union.

I. BACKGROUND

Exxel/Atmos is a New Jersey corporation that manufactures and distributes non-aerosol dispensing containers. In the summer of 1990, the Union began an organizing campaign at the Company's Somerset, New Jer-

sey facility. By mid-August it had obtained certification cards from a majority of Exxel's nineteen production and maintenance workers. Realizing that a majority of the employees supported the Union, Exxel's then-President, Peter Gould, faxed a letter to Union officials on September 7, 1990 recognizing the Union as the exclusive representative of a bargaining unit consisting of the Company's production and maintenance workers. The Union accepted Exxel's recognition, and the parties agreed to convene a negotiation meeting on September 12. Later on September 7, however, Exxel laid off five bargaining unit employees, including several of the Union's leading supporters. The Union responded by canceling the September 12 negotiation; the next day it filed an unfair labor practice complaint against the Company with the NLRB. Between September 13, 1990 and May 7, 1991, with the complaint pending, neither party attempted to contact the other regarding negotiations or for any other reason.

In early May, the Union learned that the Board planned to dismiss its unfair labor practice complaint. As a result, on May 7, 1991, Union representative Daniel Applegate contacted Bob Shiels, Exxel's newly installed President, about rescheduling the negotiation session. In what would prove to be a pivotal telephone conversation, Shiels informed Applegate that he would meet with Applegate individually to discuss "where we were," but that no formal negotiations would take place until the employees voted for Union representation in a Board-sponsored election. While acknowledging that his predecessor had voluntarily recognized the Union, Shiels stated that he "felt firmly" that the employees should have the opportunity to select their own bargaining representatives. Applegate responded that an election was unnecessary because the Company had already recognized the Union, and he declined Shiels' invitation to meet one-on-one. Shiels and Applegate had a substantially similar conversation on July 17, 1991.

Upon learning of the possibility that the Company would bargain with the Union, William O'Donnell, an Exxel supervisor, revealed to the Company's Vice–President on July 24, 1991 an anti-Union petition he had circulated during the Union's initial membership drive. At the time he circulated the petition, O'Donnell was a member of the bargaining unit. The petition bore the signatures of eight bargaining unit members (including O'Donnell's), and the date September 11, 1990 appeared next to each signature. Management was not previously aware of the petition. The next day, July 25, 1991, the Company posted the following inter-office memorandum:

TO: All Shop Personnel

FR: Bob Shiels

DATE: July 25, 1991

RE: UNITED STEEL WORKERS UNION

. We want to let you know of recent events concerning the United Steelworkers Union.

We have received a letter from the union demanding that we bargain and negotiate a contract that would establish your wages, hours and working conditions.

However, we have also learned that a number of you signed a petition in September, stating that you do not want union representation.

We really believed, when we recognized the Union, that a majority of you wanted the Union. However, in light of this petition, we are not sure what to do. We plan soon to make the right decision for all concerned.

If you have any questions, please feel free to ask [Company management].

After a number of employees (it is disputed exactly how many, but not more than six) voiced opposition to the Union, Exxel informed the Board that it no longer believed the Union represented a majority of the workers in the bargaining unit and requested a Board-sponsored election. The Union then filed this complaint.

After a two-day hearing, an ALJ concluded that Exxel violated sections 8(a)(1) and (5) of the NLRA by refusing to bargain with, and withdrawing recognition from, the Union. The ALJ found that Shiels' statements in his May 7 telephone conversation with Applegate evinced a refusal to bargain with the Union

and that such refusal constituted an unfair labor practice because a reasonable time for bargaining had not elapsed in the period between September 7, 1990, when the Union canceled the originally scheduled bargaining session and May 7, 1991, when it renewed its request for bargaining. The ALJ also noted that the employee petition was irrelevant to his determination because it came to management's attention only after Shiels' refusal to bargain on May 7, 1991.

Moving to remedial issues, the ALJ ordered Exxel to cease and desist from refusing to bargain and interfering with its employees in the exercise of their right to choose a bargaining representative under Section 7 of the NLRA. In addition, the ALJ ordered Exxel to recognize and bargain with the Union at the latter's request as the exclusive collective bargaining representative of the employees in the unit. On December 16, 1992 the Board adopted the ALJ's substantive conclusions and remedies with only minor modifications, and this petition followed.

## II. DISCUSSION

Petitioner challenges the ALJ's finding that Bob Shiels withdrew recognition from and refused to bargain with the Union in the course of his May 7 conversation with Daniel Applegate. Exxel also contends that even if it did commit an unfair labor practice on May 7, the Board's order requiring the Company to bargain with the Union is an unwarranted intrusion upon the rights of its employees to select a bargaining representative of their own choosing. We address these arguments in turn after first setting forth the governing law and relevant standards of review.

### A. Governing Law and Standard of Review

The law governing an employer's obligation to bargain with a union it has voluntarily recognized is well established. "The employer is not required to recognize a union on the basis of a majority card showing and has the option to insist on an election." *NLRB v. Creative Food Designs, Inc.*, 852 F.2d 1295, 1297 (D.C.Cir.1988) (*"Creative Food"*). If the employer chooses voluntarily to recognize the union, however, it is bound by that recognition and may no longer seek an election. *Id.* Once recognized, the union enjoys a presumption of continuing majority support. *Id.* at 1300. For a reasonable time after voluntary recognition, usually one year, that presumption is irrebuttable; after the one-year grace period, the employer may attempt to rebut the presumption of majority support by presenting to the Board " 'clear, cogent, and convincing evidence, that the union was in the minority or that the employer had a good faith reasonable doubt of majority support at the time of the refusal [to bargain].' " *Id.* (quoting *NLRB v. Tahoe Nugget*, 584 F.2d 293, 297 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979)).

The scope of our review of NLRB decisions is quite limited. We must uphold the Board's factual findings so long as they are supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 160(e) (1988); *Sullivan Indus. v. NLRB*, 957 F.2d 890, 894 (D.C.Cir.1992). Additionally, "we must accept the ALJ's credibility determinations, as adopted by the Board, unless they are patently insupportable." *Creative Food*, 852 F.2d at 1297. Finally, we owe particular deference to the Board's choice of remedy. *See NLRB v. Gissel Packing*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969) ("In fashioning its remedies under the [NLRA], the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.").

### B. Withdrawal of Recognition and Refusal to Bargain

With these clear standards in mind, we first review petitioner's contention that the record lacks substantial evidence to support the ALJ's finding that Bob Shiels, in his May 7 telephone conversation with Daniel Applegate, refused to bargain with and withdrew recognition from the voluntarily recognized Union. Initially, the Company cannot attack the ALJ's finding that a reasonable time for bargaining had not elapsed between Exxel's voluntary recognition of the Union in

September, 1990 and the May 7 Shiels/Applegate conversation because that eight-month period falls well within the one-year window within which a voluntarily recognized union enjoys a conclusive presumption of continuing majority support. Accordingly, the heart of Exxel's challenge to the ALJ's unfair labor practice finding is that Shiels did not in fact refuse to bargain with the Union on May 7.

We hold, however, that substantial evidence supports the ALJ's finding. Petitioner attempts to paint Shiels as the cautious new executive who prudently sought to avoid rushing headlong into union negotiations without first becoming familiar with all the issues involved. The Company thus argues that in the May 7 telephone conversation Shiels did not refuse outright to bargain with the Union. Instead, according to the Company, he intended merely to convey that he was unprepared to bargain with the Union *"at that time"* because he had not yet had the opportunity to confirm that his employees desired the Union's representation.

Being new on board and never having dealt with the Union, Shiels' caution is understandable. But Shiels' own testimony before the ALJ belies any suggestion that he meant only to postpone negotiations until he had familiarized himself with the issues. Shiels did not say only that he wanted to postpone bargaining until he was satisfied that his employees supported the Union; rather, he made clear that he desired an election before proceeding to negotiate with the Union. In response to the ALJ's question, "And you recall ... telling [Applegate] that you wanted an election?," Shiels replied, "That's my clear recollection.... I wanted to be sure there was an election." Based on this and similar testimony, the ALJ inferred reasonably that Shiels refused to negotiate with, or to recognize, the Union as the employees' bargaining representative "unless and until" an election was held. And, as we stated above, an employer who has previously recognized a union is not entitled to an election absent a reasonable passage of time. We therefore uphold the ALJ's findings, as adopted by the Board, that Exxel violated Sections 8(a)(1) and (5) of the NLRA.

## C. The Bargaining Order

The appropriateness of the Board's bargaining order presents a more difficult question. The ALJ's remedy in this case consisted of two orders. The first requires Exxel to cease and desist from refusing to bargain with the Union and from interfering with its employees' rights to choose a bargaining representative. The second compels the Company affirmatively to bargain with the Union at the latter's request. The Board adopted both remedies in full with no explanation.

■ Pointing to evidence that a number of past and present members of the bargaining unit have voiced opposition to the Union, Exxel asks that the Board's affirmative bargaining order be set aside in favor of an election because it infringes upon its employees' rights under Section 7 of the NLRA "to form, join, or assist labor organizations [and] to bargain collectively through the representative of their own choosing." 29 U.S.C. § 157. At a minimum, the Company asserts, the Board should be made to explain why the bargaining order is the appropriate cure for the Company's unfair labor practice.

■ Initially, we reject the Company's contention that the Board abused its discretion by not ordering an election. As we explained in *NLRB v. Creative Food Design*, 852 F.2d 1295 (D.C.Cir.1988), by voluntarily recognizing a union an employer waives its prerogative to insist upon an election. *Id.* at 1299. The company thereby agrees in effect to treat the union as if it had won an election and to afford the union all the benefits that accompany full representational status. Chief among those benefits is a conclusive presumption of continuing majority support for one year after voluntary recognition. Thus, by unlawfully refusing to negotiate with the Union absent an election only eight months after recognition, Exxel violated its promise to respect the desires of a majority of its employees and to allow the Union a reasonable time to negotiate. Because Exxel was not at liberty to request an election at that time, ordering an election after the fact would grant the Company an option to which it was not entitled when it committed the unfair labor practice. Such a result would allow employers to circumvent the one-year

presumption simply by calling for an election within that year and then presenting to the Board some evidence of an erosion of majority support. As this outcome would be inconsistent with the purposes of the NLRA, we uphold the Board's conclusion that Exxel was not entitled to an election.

 We must still decide, however, whether the Board erred in not explaining why a bargaining order, as opposed to the cease and desist order standing alone, was justified in this case. Although it might appear redundant to require a company simultaneously to cease refusing to bargain *and* to bargain upon request, the Board has attached different legal and practical consequences to the two orders. *See Caterair Int'l v. NLRB ("Caterair")*, 22 F.3d 1114, 1121–22 (D.C.Cir.1994). Cease and desist orders are remedial; they require only that the employer "conform his conduct to the norms set forth in the Act." *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 740, 81 S.Ct. 1603, 1608–09, 6 L.Ed.2d 762 (1961). Bargaining orders, in contrast, have a somewhat punitive aspect because under longstanding Board practice they are accompanied by a decertification bar that prevents employees from challenging the union's majority status for a reasonable period of time. *Sullivan Industries v. NLRB*, 957 F.2d 890, 903 (D.C.Cir.1992). While in some circumstances the decertification bar may be necessary to insulate a fragile union from employer interference, it also has the effect of ensconcing the union as the employees' exclusive bargaining representative and therefore carries with it the potential of infringing upon employees' Section 7 rights. *Caterair*, 22 F.3d at 1122. Due to the added imposition of the decertification bar, we have time and again required the Board to explain that it has balanced the often competing interests of union protection and employee choice before issuing a bargaining order. *See, e.g., Caterair*, 22 F.3d at 1123; *Sullivan Industries*, 957 F.2d at 903–04; *Williams Enterprises v. NLRB*, 956 F.2d 1226, 1237 (D.C.Cir.1992); *Avecor, Inc. v. NLRB*, 931 F.2d 924, 934–35 (D.C.Cir.1991); *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 45–47 (D.C.Cir.1980).

A strong argument can be made that the Board's decision to impose a bargaining order was justified because Exxel's refusal to bargain occurred during the first year of voluntary recognition. Unlike cases in which an unfair practice occurs after the first year, imposing merely a cease and desist order in first year refusal cases does not return the parties to status quo. *Cf. Caterair*, 22 F.3d at 1122 (noting that the cease and desist order is a "sound third option" to an election and bargaining order because it mandates a return to the status quo). The cease and desist order requires the offending company to bargain, but it does so in a context outside the protective range of the one-year conclusive presumption. In such a setting, but not in the first year, the company (or its anti-union employees) would be entitled to question the union's majority status, and thus would be in a more favorable position vis-a-vis the union as compared to before it committed the unfair labor practice. As such, the decertification bar (provided its duration is substantially tailored to restore to the union that part of the one-year period that was denied it by the company's unfair labor practice) simply affords the union the same protection it rightfully enjoyed during its first year. *See Brooks v. NLRB*, 348 U.S. 96, 104, 75 S.Ct. 176, 181–82, 99 L.Ed. 125 (1954) (upholding Board policy of barring decertification petitions filed within one year of certification); 1 HARDIN, THE DEVELOPING LABOR LAW 390 (3d ed. 1992) ("To foster collective bargaining and stabilize industrial relations, the Board has long required that in the absence of unusual circumstances a certified union's majority status must be honored for 1 year; and a [decertification] petition filed during the 1–year period will ordinarily be barred."). In other words, not imposing the bargaining order in first year refusal cases would permit the company, by committing an unfair labor practice in the first year, to frustrate the core purpose of the protective period. Such a result would actually encourage unfair labor practices by companies that during the first year become dissatisfied with the Union or the legally required bargaining process.

 But no matter how persuaded we may be by the policy arguments favoring the imposition of bargaining orders in first year refusal cases, it is not for us to apply those rationales to a particular case—at least not in the first instance. It is up to the Board, not the courts, to make labor policy. *See Amalgamated Clothing and Textile Workers v. NLRB*, 736 F.2d 1559, 1566 n. 5 (D.C.Cir. 1984) ("Because requiring unions ... to have full time organizers present during each labor campaign raises serious questions of labor policy, it is an issue for the Board, not the courts, to settle."). Moreover, it is irrelevant that the court agrees with the Board's decision: "We emphasize that we harbor no disagreement with the Board's policy choices. We ask only for a clear statement of what those choices and the reasons for them are." *Sullivan Industries*, 957 F.2d at 905 n. 12; *cf. Securities & Exchange Comm'n. v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462–63, 87 L.Ed. 626 (1943) (holding that court can affirm administrative order only on grounds on which agency relied and noting that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained"). Accordingly, we remand this case to the Board for that clear explanation.

### III. CONCLUSION

Because of the the NLRB's unique knowledge and experience in the field of labor relations, reviewing courts owe "special respect" to its choice of remedies for violations of the NLRA. *See NLRB v. Gissel Packing*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). We will continue to give those choices the deference they are due. In order to do so in the context of affirmative bargaining orders, however, we must first be satisfied that in issuing such orders the Board has balanced competing labor policies, including the employees' right to representation of their own choice, and has clearly indicated the grounds upon which the order is based. As we remarked recently, "five times in the past fourteen years, this court has remanded [bargaining] orders to the board with a request for explanation as to why, in the particular circumstances, the extra protection against decertification was necessary." *Caterair*, 22 F.3d at 1123. *Caterair* made it "an even half-dozen." *Id.* We reiterate that sentiment here, hopefully for the final time.

For the foregoing reasons, we deny the petition for review insofar as it challenges the Board's unfair labor practice finding and its decision not to order an election. However, we remand the remedial aspect of the case for the Board to explain its imposition of the bargaining order.

*So ordered.*