**EXXEL/ATMOS, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Steelworkers of America, Intervenor.**

**Nos. 97–1417 and 97–1418.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 9, 1998.

Decided June 26, 1998.

Rehearing Denied Aug. 26, 1998.

See also, 28 F.3d 1243.

Vincent J. Apruzzese argued the cause and filed the briefs for petitioner.

David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Margaret A. Gaines, Supervisory Attorney, entered an appearance.

Daniel M. Kovalik argued the cause for intervenor United Steelworkers of America. With him on the brief were Laurence Gold, David Silberman, and James Coppess.

Before: WALD, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Concurring opinion filed by Circuit Judge SENTELLE.

RANDOLPH, Circuit Judge:

These are petitions by Exxel/Atmos, Inc. to review, and cross-petitions by the National Labor Relations Board to enforce, two orders issued in June 1997. The Board issued the first of its orders on remand from our decision in *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243 (D.C.Cir.1994). The second order dealt with events in late 1994 and early 1995, after the remand.

.Exxel is a small New Jersey company manufacturing nongas aerosol delivery systems. In September 1990 the company voluntarily recognized the United Steelworkers of America, AFL–CIO as the exclusive bargaining representative of its production and maintenance employees. Nine months later, in May 1991, Exxel refused the union's request to bargain. The Board found that Exxel had thereby violated § 8(a)(1) and (5) of the National Labor Relations Act, 29

U.S.C. § 158(a)(1) & (5). *See Exxel–Atmos, Inc. ("Exxel I")*, 309 N.L.R.B. 1024, 1024, 1992 WL 390103 (1992). Among other things, it ordered Exxel to cease and desist from refusing to bargain with the union and affirmatively "to recognize, meet and bargain collectively in good faith" with the union upon request. *Id.* at 1024, 1033, 1992 WL 390103. This court upheld the Board's findings of violations of the Act and enforced the cease and desist order, but—on the basis of longstanding precedent in this circuit—we refused to enforce the bargaining order and remanded the case to the Board for a "clear explanation" of "why a bargaining order, as opposed to the cease and desist order standing alone, was justified in this case." *Exxel/Atmos*, 28 F.3d at 1248–49; *see Exxel/Atmos, Inc. v. NLRB*, 37 F.3d 1538 (D.C.Cir. 1994) (enforcing Board's order in part and remanding case in part).

The Board responded by reaffirming the bargaining order in a June 1997 supplemental decision. *See Exxel–Atmos, Inc.*, 323 N.L.R.B. No. 159, 1997 WL 309321 (June 5, 1997). On the same date, the Board issued another decision and order finding the company guilty of additional unfair labor practices. On December 7, 1994, after our remand, Ronald Lemke, Exxel's President, gave a speech to the production and maintenance employees in which he explained the procedure for decertifying the union and informed the employees that Exxel was obligated to bargain with the union unless it was decertified. Exxel also gave each of its employees a cash Christmas bonus of $100 during the week of December 23. On January 10, Exxel, pointing to signed letters to the Board from some employees indicating that they no longer wished to be represented by the union, canceled all bargaining sessions with the union, then scheduled for early 1995. Employees filed a decertification petition on January 26, and thereafter Exxel took the position that it was under no obligation to bargain until a decertification election had been held. The Board concluded that Lemke's speech, the Christmas bonus, and Exxel's refusal to bargain violated § 8(a)(1) and (5) of the Act. *See Exxel–Atmos, Inc. ("Exxel II")*, 323 N.L.R.B. No. 158, slip op. at 3, 1997 WL 309318 (June 5, 1997). As a remedy, the Board again, *inter alia*, ordered Exxel both to cease and desist from refusing to bargain and affirmatively to bargain with the union upon request. *See id.*

I

We shall deal first with the Board's decision in *Exxel II*, and Lemke's speech. Employer speech or conduct violates § 8(a)(1) if it "interfere[s] with, restrain[s], or coerce[s] employees" in their decision whether to decertify the union. 29 U.S.C. § 158(a)(1). On the other hand, the "expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

The Board's explanation for finding a § 8(a)(1) violation in Lemke's speech consists of the following (323 N.L.R.B. No. 158, slip op. at 2, 1997 WL 309318):

> In his unsolicited speech, the Respondent's president, Lemke, provided the unit employees with instructions on how to decertify the Union. In doing so, the Respondent unlawfully instigated the decertification petition among its employees in violation of Section 8(a)(1) of the Act.*

> ――――――――
> * *Weisser Optical Co.*, 274 NLRB 961, 1985 WL 45835 (1985), and cases cited therein.

The text tells us nothing. It merely recites the Board's conclusion that the speech was "unlawful." The Board's rationale, therefore, must be contained in the footnote suggesting that Lemke's speech was indistinguishable from the employer conduct condemned in *Weisser Optical* and "the cases cited therein."

In *Weisser Optical*, the Board found a § 8(a)(1) violation because the company provided more than "ministerial aid" to its employees in filing a decertification petition. A company official had asked an employee to initiate and solicit signatures for a decertification petition among the rank-and-file, "explaining that he wanted to rid the [company] of the Union." 274 N.L.R.B. at 961, 1985

WL 45835. When the employee agreed, the official gave him a booklet containing instructions and sample language to be used in gathering evidence of employee interest. *See id.* The employee then apparently abandoned the idea, so management approached a second employee "about getting something started." *Id.* (internal quotation marks omitted). After a meeting at which the company expressed its belief that no "third party" was needed to work out any differences the employees might have with the company, the first employee immediately began soliciting signatures for a decertification petition. *See id.* The petition arrived at the Board only a few days later. *See id.* Such "unsolicited involvement with the showing of interest petition," held the Board, "constituted far more than ministerial aid" and hence violated § 8(a)(1) of the Act.

The "cases cited therein," in *Weisser Optical* that is, turn out to be only one case— *Silver Spur Casino,* 270 N.L.R.B. 1067, 1984 WL 36495 (1984).[1] There, the employer had suggested to an employee—at work and in phone calls to her at her home—that a decertification petition ought to circulate among the employees. *See id.* at 1071–72, 1984 WL 36495. The employer provided her with language to use in the petition, approved a draft, told the employee how to circulate it and among whom, gave her instructions on getting it signed and dated, and told her where to send it. *See id.* When a different employee approached the employer with concerns about a union, the employer provided similar assistance for a second petition. *See id.* at 1072, 1984 WL 36495. The employer then mailed both petitions to the Board. *See id.* The ALJ held that the employer's actions violated § 8(a)(1) because they "constitute[d] far more than the mere ministerial aid such as the Board might not find unlawful." *Id.* The Board upheld the ALJ's conclusion, stating that the employer "unlawfully encouraged and assisted the employees in

repudiating the Union." *Id.* at 1067, 1984 WL 36495.

Neither *Weisser Optical* nor *Silver Spur* help to explain the Board's conclusion in this case. Whatever the precise meaning of "ministerial aid," neither decision goes so far as to hold that an employer violates § 8(a)(1) merely through statements informing employees of the decertification process. The Board explicitly rejected such a reading of § 8(a)(1) in *Lee Lumber & Bldg. Material Corp.,* 306 N.L.R.B. 408, 1992 WL 41348 (1992). The employer there had called a meeting and pointed out the disadvantages of switching to a union-proposed pension plan. *See id.* at 408, 1992 WL 41348. In response to employee questions about how to get rid of the union, the employer gave the employees general information about the decertification process and the location of the Board's office, adding that any decertification petition "would have to be filed soon." *Id.* The Board thought the employer's statements caused concern among the employees and triggered the filing of a decertification petition. *See id.* at 410, 1992 WL 41348. Even so, it held that this did not make the statements unlawful under § 8(a)(1). "It is clear that, under Section 8(c), an employer may lawfully furnish accurate information . . . if it does so without making threats or promises of benefits . . . . Otherwise lawful statements do not become unlawful . . . [under § 8(a)(1) ] merely because they have the effect (intended or otherwise) of causing employees to abandon their support for a union." *Id.* at 409–10, 1992 WL 41348 (footnotes omitted). The employer's motive and the actual effect of its statements are irrelevant. *See id.* at 409, 1992 WL 41348. Instead, "the test is whether the employer's statements may reasonably be said to have tended to interfere with employees' exercise of their Section 7 rights." *Id.* (footnote omitted); *see also Lucky 7 Limousine,* 312 N.L.R.B. 770, 804, 1993 WL 402901 (1993).

---

1. *Weisser Optical* also contained citations to *Texas Elec. Coop.,* 197 N.L.R.B. 10, 1972 WL 4491 (1972), and *Craftool Mfg. Co.,* 229 N.L.R.B. 634, 1977 WL 8653 (1977). The Board cited those cases, however, not to explain when an employer violates § 8(a)(1) by assisting employees in filing

a decertification petition, but rather to support its statement that reliance on a tainted decertification petition is no defense to a withdrawal-of-recognition charge. *See Weisser Optical,* 274 N.L.R.B. at 962, 1985 WL 45835.

Lemke's speech did not offend this standard. Lemke, and hence Exxel, doubtless intended to do more than merely make a public service announcement. It is fair to assume they hoped the employees would act on the information. But *Lee Lumber* makes the motivation of the employer irrelevant. As to the content of the speech, the part with which the Board took issue simply informed Exxel's employees that a decertification procedure existed for employees who decided they no longer wanted to be represented by a union.[2] For all we know, the employees were already aware of this. After briefly (and accurately) explaining the procedure, Lemke said that anybody "who wants more information ... can call the Labor Board to get more details about how to file for [a decertification] election." J.A. 61. He also left copies of the Board's address and phone number in the meeting room. Before concluding, Lemke told the employees, "The decision about whether to file a petition with the Labor Board for a Decertification Election is entirely up to you. The Company will not take any action against anyone because he has or has not signed a petition." J.A. 61. We presume the Board saw something coercive or threatening in these statements, but we are unable to detect anything of the sort. Unlike the employers in *Weisser Optical* and *Silver Spur*, who arguably pressured individual employees to participate in the decertification process, Lemke delivered his speech to Exxel's employees collectively. Moreover, his statements were remarkably similar to those in *Lee Lumber*, doubtless because an attorney for the company wrote the speech. Short of saying nothing at all, it is hard to see how Lemke could have been more careful about not interfering with the employees' free choice and yet still informed them of the availability of the decertification procedure.

At any rate, since the Board chose not to explain why it believed the speech constituted "unlawful instigation," its citation to a clearly distinguishable precedent is not enough to warrant sustaining its conclusion that Exxel violated § 8(a)(1).

## II

■ On the Wednesday or Thursday before Christmas 1994, each employee received from Exxel a $100 bill contained in a greeting card signed by Exxel's management. The Board, pointing out that the " 'Christmas bonus' was related to the increased sales performance of [Exxel's] employees in 1994," found that the bonus "constitutes wages, and as such, is a proper subject for collective bargaining." *Exxel–Atmos*, 323 N.L.R.B. No. 158, slip op. at 3, 1997 WL 309318. Exxel did not bargain with the union before awarding the bonus and so the Board concluded that the company violated § 8(a)(1) and (5). *See id.*[3]

The Board's conclusion lacks substantial evidence. The Act requires employers to bargain collectively with unions over "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). A "Christmas bonus ... becomes an element of

---

**2.** The Board focused on the following portion of Lemke's speech:

> What if we don't want a union? Is there anything we can do about it? Yes. The Labor Board has a procedure called a Decertification Election. This would allow the employees to vote, in a secret ballot election, on whether you truly want the union to represent you. The Board will conduct a Decertification Election if 30% of the employees take or send a petition to the Labor Board stating that they do not want the union to represent them. · Anybody who wants more information about this procedure can call the Labor Board to get more details about how to file for an election. I will leave copies of the Labor Board's address and telephone number here in this room. I want to say as clearly as I possibly can that the Company intends to comply with the law and with the court's order [in *Exxel I*]. The decision about whether to file a petition with the Labor Board for a Decertification Election is entirely up to you. The Company will not take any action against anyone because he has or has not signed a petition.

J.A. 61.

**3.** Notably, the Board did not rest its conclusion that the Act was violated on a finding that Exxel presented the bonus with the intent of demonstrating to its employees "that the Union was irrelevant," or as part of a "concerted strategy to weaken and discredit the union in the eyes of the employees." *Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 253 (D.C.Cir.1991) (citation and quotation marks omitted). Such a finding would be subject to a very different analysis.

wages and, therefore, a term and condition of employment that cannot be altered unilaterally" if it is "tied to other remuneration and paid regularly over an extended period." *International Bhd. of Elec. Workers Local 1466 v. NLRB*, 795 F.2d 150, 153 (D.C.Cir.1986). The bonus here was not tied to the wages of the employees. It was linked neither to seniority nor to each employee's individual performance. And, perhaps most telling, there is no evidence that Exxel had ever paid such a bonus to its employees in the past. *See id.* (Christmas bonus found to be "a part of the employees' wages" where it was "a regular practice going back some forty years"); 5 THEODORE KHEEL, LABOR LAW § 19.04, at 19–18 to –19 (1997) (cases finding bonuses to be wages "have primarily relied on the regularity of the payment over a sufficient period of time"); *Sykel Enters., Inc.*, 324 N.L.R.B. No. 171, slip op. at 3–4, 1997 WL 704931 (Nov. 7, 1997) (crucial question in determining whether Christmas bonus constitutes wages is whether employer's pattern of paying bonus in past has justified employees' expectations that they could count on receiving it as part of wages in future as well).

In short, the record plainly shows that the bonus was a seasonal gift. The previous Christmas, Exxel had hosted a buffet luncheon party for its employees. The next year it gave them cash because it was the first year Exxel had turned a profit. That did not transform the $100 bonus into "an integral part of [Exxel's] wage structure." *Niles–Bement–Pond Co.*, 97 N.L.R.B. 165, 166–67 (1951).

## III

█ This brings us to Exxel's refusal to bargain with the union in early 1995. In enforcing the Board's cease and desist order in *Exxel I*, we ordered Exxel to "[c]ease and desist from ... [w]ithdrawing recognition from and refusing to meet and bargain collectively with" the union. *Exxel/Atmos, Inc. v. NLRB*, 37 F.3d 1538 (D.C.Cir.1994) (en-

forcing Board's order in part and remanding case in part). It was "utterly clear" that our order put Exxel under an affirmative obligation to bargain with the union as of November 30, 1994, the date our mandate issued. *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1123 (D.C.Cir.1994).[4] Even so, Exxel did next to nothing. It held no bargaining sessions with the union in the weeks leading up to January 10. And when on that date Exxel learned of an impending decertification effort on the part of some of its employees—it is unclear whether Exxel knew exactly how many employees supported the effort, but it is clear that no decertification petition had been filed at that time—it promptly canceled all planned bargaining sessions with the union, including one scheduled for the next day. We acknowledge that under some circumstances an employer may suspend bargaining if it "can show, by 'clear, cogent and convincing' evidence, either that the union has lost majority support or that the employer has a reasonable, goodfaith doubt of continuing majority support." *Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 253 (D.C.Cir.1991) (citation omitted). We also recognize that Exxel twice requested by letter, once on January 10 and again on January 30, that the Board inform it whether a majority of Exxel's employees had petitioned for decertification, and that the Board refused the request. But none of this excused Exxel from complying with our order. Exxel should have bargained with the union as soon as was practically possible following the issuance of our mandate. At the very least, it should have gone ahead with the scheduled bargaining sessions until January 26, when a formal decertification petition was filed. *See, e.g., St. Agnes Med. Ctr. v. NLRB*, 871 F.2d 137, 146 (D.C.Cir.1989); *Allied Indus. Workers, Local Union No. 289 v. NLRB*, 476 F.2d 868, 881 (D.C.Cir.1973); *NLRB v. New Assocs.*, 35 F.3d 828, 833–35 (3d Cir.1994). Exxel's refusal to do so constituted a direct violation of our order and hence was clearly unlawful.

---

4. An affirmative bargaining order and an order requiring an employer to "cease and desist" from refusing to bargain do not have the same consequences. Under settled Board practice, only the former carries with it a decertification bar, preventing the employer from challenging the union's majority status for a reasonable period of time. *See, e.g., Exxel/Atmos*, 28 F.3d at 1248; *Caterair*, 22 F.3d at 1121–22 & n. 4.

As a remedy for Exxel's recalcitrance, the Board once again issued a bargaining order. Relying on our decision in *Exxel I,* the company argues that the Board failed to justify the bargaining order. But there is an essential difference between the two cases: here, Exxel never contested the propriety of the bargaining order in the proceedings before the Board. Accordingly, under § 10(e) of the Act, Exxel waived any right it had to object to the order before this court. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board ... shall be considered by the court...."); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (failure to "object[ ] to the Board's decision in a petition for reconsideration or rehearing ... prevents consideration of the question by the courts"); *Quazite v. NLRB,* 87 F.3d 493, 497–98 (D.C.Cir.1996) (refusing to consider employer's argument that Board did not adequately explain need for bargaining order because employer did not raise objection before Board). It is of no moment that the Board neglected to invoke § 10(e) in its brief to this court. Section 10(e) "speaks to courts, not parties," and the Board cannot waive its jurisdictional requirements simply by neglecting to mention them before us. *EEOC v. FLRA,* 476 U.S. 19, 23, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986) (per curiam).[5]

The petition for review in No. 97–1417 is granted in part and denied in part. Enforcement of the Board's order is denied on the speech and bonus questions in No. 97–1417. The remainder of the Board's order in No. 97–1417 is enforced. The petition for review in No. 97–1418, and the Board's cross-application for enforcement, are dismissed. *See* note 5, *supra.*

*So ordered.*

SENTELLE, Circuit Judge, concurring:

I join without reservation in the Court's conclusion that under section 10(e) of the Act, 29 U.S.C. § 160(e), we lack jurisdiction to review the second bargaining order. I write separately to express my hope (probably a vain one) that the Board will not find in our declining any suggestion that we consider the reasoning in its supplemental opinion adequate to support the extraordinary remedy invoked in its original bargaining order in *Exxel/Atmos, Inc. v. NLRB,* 28 F.3d 1243 (D.C.Cir.1994). In *Exxel,* we reiterated to the Board the well established law of this Circuit that the issuance of a bargaining order is an extraordinary, "somewhat punitive," remedy which "has the effect of ensconcing the union as the employees' exclusive bargaining representative and therefore carries with it the potential of infringing upon employees' Section 7 rights." 28 F.3d at 1248 (citing *Caterair Int'l v. NLRB,* 22 F.3d 1114, 1122 (D.C.Cir.1994)). Therefore, "we have time and again required the Board to explain that it has balanced the often competing interests of union protection and employee choice before issuing a bargaining order." *Exxel,* 28 F.3d at 1248 (citing, *inter alia, Caterair,* 22 F.3d at 1123). On remand, instead of complying with its duty to balance, the Board, continuing in the rogue behavior which we have noted time and again, simply declared the appropriateness of its original remedy, incredibly stating as its sole basis its prior decision in *Caterair Int'l,* 322 N.L.R.B. No. 11, 1996 WL 514512 (Aug. 27, 1996).

Lest there be any doubt, the Board's *Caterair* is the very decision which we reversed, noting that we were ordering the Board *for the sixth time* to cease engaging in its contumacious behavior. *See Caterair,* 22 F.3d at 1123. Once again, our orders and admonitions to the Board seem to have fallen on deaf ears. Not only does it continue to engage in precisely the process we have condemned in the past, but even cites in support of this recalcitrant behavior the *Caterair* decision for which we condemned it.

As I have previously suggested, I think we have been overly gentle in our line of cases, including *Caterair,* rejecting the Board's facile imposition of the extraordinary bargaining orders remedy. *See Lee Lumber & Bldg. Material Corp. v. NLRB,* 117 F.3d 1454,

---

5. Because we enforce the Board's June 5, 1997, bargaining order in *Exxel II,* there is no need for us to consider whether the Board's supplemental opinion adequately supported the original bargaining order issued by the Board in *Exxel I.* The two bargaining orders are effectively identical.

1463–64 (D.C.Cir.1997) (Sentelle, J., concurring). In no other area of our enlightened democratic society would we permit an elitist bureaucracy to deprive citizens of their rights as free actors on the theory that they might have been so deceived by others of differing interests that they cannot by their free choice determine their best interests, but must be subjugated to the decision of an administrative agency. *Id.* While we can conceive of a commission regulating corporations tossing out the election of a corporate board based on deceit practiced against the shareholders, no one has ever suggested that such a commission could then impose indefinitely on the shareholders an unelected board, on the rationale that shareholder votes thereafter would be the product of "tainted" decisionmaking. We might even imagine an election of a public official being overturned because of fraud, but it is surely inconceivable that a board or commission could then impose its own choice of congressman, senator, or governor because of some continuing taint. Nonetheless, the NLRB persists in its elitist belief that those of the working class cannot be trusted to reject deceit on their own, and that, therefore, their benevolent big brother must watch after them.

Were we not bound by *stare decisis,* I would find few if any circumstances under which I would uphold a bargaining order. However, I recognize that this Court is bound by precedent. The time has long since come for the Board to recognize not only the constraints of precedent, but its statutory and constitutional duty to obey the law as interpreted by the courts. Under 29 U.S.C. § 160, this Court has jurisdiction to review the orders of the Board. On at least seven occasions we have exercised that jurisdiction to tell the Board that its routine imposition of remedial bargaining orders is contrary to law. *See* cases collected in *Lee Lumber,* 117 F.3d at 1461; *Exxel,* 28 F.3d at 1248. Eight is enough.