**DOUGLAS FOODS CORP., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 00–1241.

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 2001.

Decided June 12, 2001.

Theodore R. Opperwall argued the cause and filed the briefs for petitioner.

David A. Seid, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter Winkler, Supervisory Attorney.

Before: SENTELLE, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Douglas Foods Corporation ("DFC") petitions for review of an order of the National Labor Relations Board ("NLRB") finding that it committed several unfair labor practices and ordering substantial relief. We uphold the bulk of the NLRB's unfair labor practice findings with the exception of those related to the alleged "sham" sales of catering trucks and routes. The NLRB's findings in relation to these transactions are inadequate, and the accompanying restoration order is beyond the scope of the Board's remedial authority. We also vacate the NLRB's bargaining order, and remand to the NLRB for further proceedings not inconsistent with this opinion.

## I. Background

### A. *Relevant Facts*

Petitioner DFC, a mobile food catering business in Garden City, Michigan, runs a "wholesale" operation that supplies catering trucks operated by other firms. Throughout much of its history, DFC also operated as a "retail" caterer, owning and operating catering trucks which sold pre-packaged foods to employees at local businesses along designated catering routes.

In mid–1995, DFC operated approximately twelve "hot" trucks and twelve "cold" trucks. "Hot" trucks serve hot and cold food and are operated by a driver and a cook. Cold trucks do not have cooks and sell only cold food. Each truck services a prearranged route on a regular schedule. At the time, DFC also supplied several catering trucks run by independent owner-operators. All of the trucks—DFC's and those of the owner-operators that operated out of DFC's facility—sold food prepared by Ezzo's Food, another company owned by DFC president and founder Douglas George and his wife.

At the time, DFC's drivers and cooks were divided between designated employees and lease operators. The former received hourly wages and operated off of a time clock. The latter payed daily lease fees to DFC and would keep their net revenues. Lease fees ranged between $0 and $150 per day. George expressed a preference for lease operators over employees because he believed that they had a greater financial stake in satisfying their customers. It was difficult to retain lease operators, however, which prompted DFC to hire more drivers as employees. Whether drivers were lease operators or employees, as a general rule their trucks were emblazoned with the DFC logo and housed at the DFC facility. DFC also controlled the menus, retail prices, and catering routes, and imposed a dress code on drivers.

For a variety of reasons, some of which are disputed, George decided in 1995 to extricate DFC from the "retail" side of the catering business and expand operations on the "wholesale" side. Pursuant to this plan, in October 1995 George sold all twelve of DFC's cold trucks to JK Food Service, LLC, a company established by John Schemanske, George's brother-in-law and then-General Manager of DFC. While under new ownership, these trucks maintained the DFC logo and menu. DFC contends that it also sought buyers for its twelve hot trucks and routes at this time, but without any success.

### B. *The Unionization Effort*

In December 1995, DFC hired Debra Beck as a driver. Shortly thereafter, Beck contacted the Local 876 of the United Food and Commercial Workers Union ("Union") about organizing a campaign for representation. Over the next several months, Beck, her cook Michelle Benkert, and a handful of other DFC employees distributed union authorization cards and encouraged DFC members to sign them.

In June 1996, George learned of "problems" among his employees. Around that time, DFC's sales manager, William Tofilski, questioned Beck about union activities. Over the next month, Tofilski had several conversations with DFC employees in which he disparaged union organizational efforts, asked who had signed authorization cards, and implied that George would retaliate in some form were the employees to unionize because DFC could not afford to meet likely union demands. *Douglas Foods Corp.*, 330 NLRB No. 124, slip op. at 7–9, 2000 WL 284304 (Mar. 13, 2000). Tofilski recounted that in the 1970s, when DFC was first unionized, George sold off routes to prevent unionization, and suggested George would do so again.

By July 3, the Union had nineteen signed authorization cards and filed a petition with the NLRB seeking to represent the employees of "Douglas Foods/J&K Foods." The Union sought recognition from DFC, but DFC refused. At a subsequent NLRB representation hearing, DFC informed the Union that the unionization efforts would not forestall its plans to sell the twelve hot trucks and routes. In response to this and Tofilski's prior remarks, the Union filed unfair labor practice charges against DFC.

On July 22, before the complaints were filed, DFC agreed to an election covering all DFC hourly and lease drivers, cooks, mechanics, maintenance and store employees. Prior to the election, George held several mandatory-attendance meetings with DFC drivers. At one meeting, George explained that lease operators would "have a problem" maintaining their relationship with DFC should the company unionize. *Douglas Foods*, 330 NLRB No. 124, slip op. at 11. Prior to the election George also met with a cook, Ebtisam Kassouma, said he would raise her salary, and encouraged her to vote against union representation.

The election was held on August 23. Sixteen employees voted against the Union, twelve voted in favor with two challenged ballots. The Union also lost the election at JK Foods, 11–1. *Id.* at 12. Upon learning of the results, two DFC employees who had actively supported the Union quit, and the Union filed an additional unfair labor practice charge against DFC and requested that the NLRB issue a bargaining order.

Shortly after the election, George resumed his efforts to sell DFC hot trucks and routes. According to DFC, George was now willing to sell trucks and routes individually or in small groups, rather than in large groups or as a whole (as he had done with the cold trucks). In September,

George announced that Tofilski and Mary Jo Merollis, Tofilski's sister and a prior DFC employee, had each agreed to purchase three hot trucks and routes. George informed his employees that this did not threaten their jobs, and that they would likely be retained as were the cold truck workers when they were sold to JK Food Service. *Id.* Although the announcement was made in late September, Tofilski and George did not sign the formal papers (dated October 21, 1996) until January 1997. Under the agreement, DFC financed the truck purchases and Tofilski was required to make weekly payments and sign a security agreement. He also had to guarantee that he would purchase 75 percent of his food from DFC. So long as Tofilski's trucks were operated in accordance with DFC guidelines, DFC agreed not to compete with his new business along its routes. Merollis executed similar agreements with DFC on January 31, 1997, but was later excused from the supply agreement.

In early October, DFC revised its time clock policy after it was fined by the Department of Labor for violating the Fair Labor Standards Act. *Id.* at 5. That month, on two separate occasions, Michelle Benkert punched out late in violation of the policy. Benkert received a warning after the first violation. After the second she was fired. DFC cited the time clock violations and other performance issues about which she also had been warned. Benkert and the NLRB claim that the time clock violations were a pretext for firing her due to her union activity.

On November 22, Pam Cummins, an independent operator of a cold truck route purchased in 1995, purchased the hot truck and hot truck route driven by Debra Beck. DFC financed the purchase in much the same manner as the prior hot truck sales, though Cummins was required to purchase

food exclusively from DFC. That day, George informed Beck that the truck and route had been sold and that she would be laid off. George did not inform her that JK Food Service was advertising for catering route operators. *Id.* at 14, 16. Cummins hired a new driver for the truck and retained the cook who worked with Beck. Cummins returned the truck and route in February 1997 because she was unable to make a profit on it, but DFC then resold it to another route operator. By mid–1997, DFC had sold all of its hot trucks and routes and was completely out of the "retail" catering business. Most of the trucks were sold to present route drivers with financing arrangements and supply agreements similar, but not identical, to those adopted by Tofilski and Cummins.

### C. *Proceedings Below*

On March 6, 1998, an NLRB Administrative Law Judge ("ALJ") ruled on the Union's complaints. The ALJ found that DFC had committed numerous unfair labor practices in violation of sections 8(a)(1) and (3), and sections 2(6) and (7) by:

- creating the impression that DFC was surveilling employee union activities;
- threatening employees for engaging in union activities;
- interrogating employees about their union activities;
- suggesting that unionization would "be futile";
- threatening to retaliate against employees who testified about unfair labor practices;
- giving an employee a pay raise prior to the election while suggesting that she should vote against the Union;
- intimidating, disciplining, retaliating against, and laying off Beck;
- firing Benkert;
- closing/selling off the hot truck operations; and

- terminating the employment of some or all of the hot truck drivers and cooks.

*Id.* at 24. The ALJ further found that DFC's truck and route sales were "sham" transactions motivated by anti-union animus. *Id.*

The ALJ concluded that "[a]t all times since July 3, 1996" the Union was the exclusive and appropriate representative of DFC employees because a majority of DFC employees had signed union authorization cards. *Id.* The ALJ held that DFC's unfair labor practices were "so serious and substantial in nature" that there could not be a fair union election relying solely on traditional remedies. *Id.* Based on this conclusion, the ALJ ordered DFC to cease and desist from its unfair labor practices, offer to reinstate Beck and Benkert with back pay, "reestablish" its hot truck operations, offer reinstatement to all hot truck drivers and cooks who were terminated when their routes were sold, and recognize and bargain with the Union as the exclusive bargaining representative of DFC employees. *Id.* at 24–25.

DFC appealed. The NLRB upheld the ALJ's findings in all major respects. The Board was unanimous that DFC engaged in numerous unfair labor practices, including the intimidation of its employees and other efforts to discourage unionization. Member Hurtgen dissented with regard to four findings. First, Hurtgen found "no threat" in George's comment to lease operators that their relationship with DFC would change upon unionization, as this was based on his good faith belief that the lease operators were independent contractors. *Id.* at 4 (Member Hurtgen, dissenting). Second, he found nothing unlawful about the "interrogation" of Lisa Bowman about signing a union authorization card as she initiated the discussions with management and concluded that nothing George

said was threatening or coercive. *Id.* Third, Hurtgen did not find the termination of Benkert to be unlawful, particularly because she had received warnings and the new time clock policy was prompted by a Labor Department enforcement action that cost DFC several thousand dollars. *Id.* at 4–5. Fourth, Hurtgen did not agree with the majority of the Board that DFC committed the sort of "hallmark" violations that would justify a bargaining order under *NLRB v. Gissel Packing Co. Id.* at 5. Hurtgen did not dispute the finding that the hot truck and route sales were "sham" transactions.

The Board unanimously adopted the bulk of the ALJ's ordered remedies, including the order that DFC reestablish its hot truck operations and reinstate the laid-off hot truck drivers and cooks. The Board was split on the bargaining order. A majority upheld the order, while Member Hurtgen dissented, arguing that "traditional remedies" and a cease and desist order would be sufficient to remedy the situation and allow for a fair union election to take place. *Id.*

## II. Unfair Labor Practices

Petitioner DFC challenges several of the NLRB's unfair labor practice findings and other factual determinations. Specifically, DFC contests the findings that it violated National Labor Relations Act ("NLRA") section 8(a)(3) by firing Benkert and laying off Beck, and that, through George and Tofilski, it violated NLRA section 8(a)(1) by monitoring and investigating employees' union-related activities, making discouraging or threatening statements about the potential impact of unionization, and interfering with the exercise of NLRA-protected rights by giving an employee a pay raise just prior to the unionization vote.

Under section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights guaranteed under NLRA section 7, 29 U.S.C. § 157. Under NLRA section 8(a)(3), 29 U.S.C. § 158(a)(3), it is an unfair labor practice "to encourage or discourage membership in any labor organization" through discriminatory employment decisions. As interpreted by the NLRB and federal courts, section 8(a) prohibits various anti-union conduct including, among other things, coercively interrogating employees about union activities, *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C.Cir.1998), threatening retaliation or other adverse actions in response to union organizing activity, *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d 1354, 1364–66 (D.C.Cir. 1997), and seeking to influence union activities by granting benefits to employees, *General Electric Co. v. NLRB*, 117 F.3d 627, 636–37 (D.C.Cir.1997).

Judicial review of NLRB unfair labor practice findings is limited. *See, e.g., Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C.Cir.1991). The NLRB's conclusions of fact are conclusive if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "If there is substantial evidence to support the Board's conclusions, we will uphold the Board's decision even if we would have reached a different result had we considered the question *de novo*." *Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C.Cir. 1994). An ALJ's credibility determinations, once adopted by the Board are due particular deference, and "must be accepted by this court 'unless they are patently insupportable.'" *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 425 (D.C.Cir. 1996) (quoting *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1246 (D.C.Cir.1994) ("*Exxel/Atmos I*")).

Applying this highly deferential standard of review, we uphold the bulk of the Board's unfair labor practice findings. Petitioner raises questions about several of the ALJ's conclusions, and presents evidence that could well justify contrary conclusions by a finder of fact. Nonetheless, the Board's unfair labor practice findings are supported by substantial evidence in the record, which is all that the law requires. The NLRB's only findings which are notably deficient are those related to the alleged "sham" sales of catering trucks and routes discussed below.

### III. "Sham" Sales & Reestablishment Order

■ Petitioner DFC specifically objects to the NLRB's finding that all of its sales of hot trucks and catering routes were "sham" sales motivated by an intent to prevent DFC unionization. DFC also challenges the restoration order issued by the NLRB to redress this alleged unfair labor practice. While anti-union animus may well have motivated the decision to sell the hot trucks and routes, there is not substantial evidence to support the NLRB's conclusion that the sales were "sham" transactions. The Board's findings are incomplete and there is inadequate attention to aspects of the sales which cast doubt on the "sham" characterization. Even were the NLRB's findings adequate in this regard, we have grave doubts that the restoration order could be upheld. We have no doubt, however, that this portion of the Board's remedy cannot be justified on the current record and must be vacated.

This Court generally defers to the factual findings of the NLRB, as discussed above. *See supra* Part II. However, this Court does not "merely rubber-stamp NLRB decisions," *Avecor*, 931 F.2d at 928, as we must "consider not only the evidence supporting the Board's decision but also 'whatever in the record fairly detracts from its weight,'" *Schaeff, Inc. v. NLRB*, 113 F.3d 264, 266 (D.C.Cir.1997) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Where the NLRB adopts a conclusion that is without support in the record, or which conflicts with the record "considered as a whole," we may reverse. *See* 29 U.S.C. § 160(e) (Board conclusions of fact are conclusive if "supported by substantial evidence on the record considered as a whole").

DFC sold all of the hot trucks and routes between October 1996 and March 1997. *Douglas Foods*, 330 NLRB No. 124, slip op. at 16. Although neither the ALJ nor the Board catalogs all of the sales, the ALJ's decision reports that all of the trucks were initially sold to former DFC employees or supervisors. All of the truck drivers and cooks employed on the trucks at the time of the sales, save for Debra Beck, were hired by the truck purchasers. *Id.* The timing of the sales, DFC management's anti-union sentiments, and "the nature of the transactions themselves" led the ALJ to conclude that all of the sales "were not arms-length transactions and were 'shams' motivated in large part by DFC's desire to thwart the Union's efforts to overturn the results of the August 1996 election and obtain a bargaining order from the NLRB." *Id.* On this basis the ALJ ordered DFC to reacquire the sold trucks and routes, and reinstate those employees who were terminated from DFC as a result of the sales. Reacquisition would not be difficult, the ALJ reasoned, because it would only require "paper transactions." *Id.* at 25. The Board adopted this conclusion without comment.

Reviewing the "sham" sale determinations is difficult, as an initial matter, due to the ALJ's incomplete treatment of the subject. The ALJ discusses several of the truck and route sales at length. Others,

the ALJ does not discuss at all. According to the ALJ, DFC had twelve hot trucks and routes, and sold all of them as part of "one plan to eliminate the bargaining unit." *Id.* at 18. Yet the ALJ does not identify the basis for this conclusion with respect to all of the truck sales, leaving us to wonder what it was about "the nature of the transactions themselves" that led the ALJ to its conclusion that all of the sales were "sham transactions."

The incomplete analysis is significant because, despite their similarities, the sales were not identical, cookie-cutter transactions. Different trucks and routes were sold on different terms. As with lease operators, different purchasers paid different monthly installments. While most purchasers signed supply agreements with DFC, Sheila Thomas did not, *id.* at 18 & n. 37, and Merollis was also released from the supply agreement covering the three trucks she purchased as well, *id.* at 18. With further respect to Merollis the ALJ found and the Board affirmed that she "has her own workers compensation insurance, product liability insurance, accountant, tax identification number, and other indicia of independence from DFC." Without further reasoning or explanation, the ALJ proceeded to conclude, and the Board to affirm, "that the totality of the record indicates that the sale to her was a sham transaction motivated in large part by DFC's desire to thwart the Union." *Id.* We are not required to rubberstamp a conclusory reference to "totality of the record" without some further expressed reasoning or other record support for the otherwise inexplicable conclusion. *See Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 42 (D.C.Cir.1980).

The present case is easily distinguishable from prior instances in which we have upheld NLRB findings of "sham" transactions motivated by anti-union animus. In *Fugazy Continental Corp. v. NLRB,* 725 F.2d 1416 (D.C.Cir.1984) and *O'Dovero v. NLRB,* 193 F.3d 532 (D.C.Cir.1999), we affirmed NLRB findings of "sham transactions" motivated by anti-union animus. In each of these cases, the transactions occurred between the employer and an "alter-ego" that allowed the "disguised continuance" of the employer's operations. *Fugazy,* 725 F.2d at 1419. Such a finding of "alter-ego" status can be based upon "substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the old entity and its successor." *Fugazy,* 725 F.2d at 1419. While "common ownership is *not* an absolute prerequisite to a finding of alter ego status," *id.* at 1420, it weighs heavily in the alter ego determination. In *O'Dovero,* for example, the employer controlled two companies and closed one to prevent unionization, while shifting its business to the other.

Neither the ALJ nor the Board found that the trucks and routes were purchased by an "alter ego" of DFC. On the present record, such a finding could not be sustained. Several factors point strongly against such a finding. In both *Fugazy* and *O'Dovero,* there was little evident purpose to the transaction other than to rid the employer of pro-union employees without altering the employer's underlying business. Here, however, DFC's employees retained their jobs—albeit with different employers—and DFC altered the nature of its business, eliminating "retail" functions.

While it is likely that the lack of a record-supported alter-ego finding would alone render the NLRB's restoration order reversible, the Board's failure to consider the feasibility and impact of the remedial order makes it certain. While the ALJ and NLRB are convinced that the truck and route sales were no more than paper transactions, a review of the trans-

actional documents makes clear that ownership and control of the trucks changed hands. The ALJ notes that "[o]ne must assume that the purchasers received something of value in exchange for [their] weekly payments." *Douglas Foods*, 330 NLRB No. 124, slip op. at 25. Precisely. It is called "title." Whatever the motivation for the sales, it is uncontestable that title has passed to new owners for at least some of the sold trucks. This alone suggests the sales, or at least some of them, were not "sham transactions." *Cf. Naperville Ready Mix, Inc. v. NLRB*, 242 F.3d 744, 753 (7th Cir.2001) (noting Board did not invoke "sham transaction" doctrine where legal transfer of title was undisputed). It is also sufficient to require remand of the restoration order.

Neither the ALJ nor the NLRB ever considered whether reacquisition of the sold trucks and routes is factually possible, nor whether an order for their reacquisition is within the legal authority of the Board—a proposition which we frankly doubt. The NLRB's casual treatment of the implications of its order is startling. Even if the truck sales were motivated by anti-union animus, title passed to the truck purchasers, many of whom were among the employees the Board is purporting to protect. Be that as it may, we return to the more fundamental question of the Board's lawful authority to enter the remedy at all.

When the NLRB orders an employee to be reinstated, its order typically requires that the company *offer* reinstatement, as DFC is required to do here for those employees laid off as a result of the sales. This is the limit of the NLRB's equitable power—it may order the employer to reinstate a former employee, but it cannot order the employee to take back the position and return to work. It seems that the analogous result here would be for the NLRB at most to order DFC to *offer* to

repurchase trucks and routes, not to *require* restoration of the *status quo ante*. Here, the NLRB ordered DFC to "restore and resume [its] hot truck catering operations as they existed prior to October 1, 1996" within fourteen days of the order, *Douglas Foods*, 330 NLRB No. 124, slip op. at 6, without any explanation of its authority to enter such order or DFC's ability to carry it out.

■ In its brief, the NLRB argues for the first time that the contracts contained boiler-plate language excusing either party from obligations due to intervening circumstances, such as actions or proceedings against one of the parties or the enactment of regulation. Brief for the NLRB at 58. We do not consider this argument as it was not relied upon by the Board or ALJ. "We cannot sustain agency action on grounds other than those adopted by the agency in the administrative proceedings." *Macmillan Publ'g Co. v. NLRB*, 194 F.3d 165, 168 (D.C.Cir.1999). Even were this language referred to in either the ALJ or NLRB opinion, it would seem insufficient to allow for the forced sale of trucks and routes to DFC. Even in its brief, the NLRB cites no authority for this proposition.

The NLRB portrays this part of its order as a run-of-the-mill requirement that the employer undo the effects of discriminatorily motivated changes. Yet the NLRB cites no case in which similar relief was ordered in similar circumstances. In *O'Dovero*, there was no dispute that the closed business was never formally dissolved and "could resume a project 'tomorrow' if it so chose." 193 F.3d at 537. As this Court concluded, "the Board's order require[d] no more than a return to the status quo ante with respect to 'work assignment decisions.'" *Id.* at 539 (citation omitted). This is hardly analogous to the forced repurchase of independently owned

assets. With the exception of Beck, all of DFC's former drivers and cooks are now either truck owner-operators or their employees, *Douglas Foods,* 330 NLRB No. 124, slip op. at 16, and the NLRB has substantial authority to address DFC's unfair labor practices through more traditional forms of relief. For these reasons, we vacate the Board's finding that the truck and route sales were "sham" transactions along with the Board's restoration order.

### IV. Relief for Beck and Benkert

Petitioner specifically challenges the award of relief to Beck and Benkert due to their alleged dishonesty during the unfair labor practice proceedings. In his decision, the ALJ found that some of Beck and Benkert's testimony was inaccurate and "suspicious." *See id.* at 13 n. 23, 21 n. 41. Due to these findings, DFC maintains that Beck and Benkert should not be entitled to any relief, let alone reinstatement and backpay. While we share DFC's concern that NLRB proceedings not be tainted with false or misleading testimony, we find no basis for vacating the Board-ordered remedies on this account.

■ As in *ABF Freight Sys., Inc. v. NLRB,* the issue presented by DFC's petition "is not whether the Board *might*" bar relief to employees who offer false testimony, "but whether it *must* do so." 510 U.S. 317, 323, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994). In *ABF*, the Supreme Court answered in the negative. While the Board may be under an obligation to consider the veracity of witnesses in an unfair labor practice proceeding, it is under no obligation to foreclose relief to all those who offer inaccurate testimony or otherwise compromise the integrity of Board proceedings. Whether to penalize a party for such misconduct, rather than defer to other potential civil and criminal remedies, is a matter committed to the Board's "broad

discretion." *Id.* at 325, 114 S.Ct. 835. Therefore, this portion of DFC's petition for review is denied.

### V. Bargaining Order

■ The NLRB concurred with the ALJ that a bargaining order was "appropriate and necessary" to remedy the severe unfair labor practices committed by DFC. *Douglas Foods,* 330 NLRB No. 124, slip op. at 3. This Court generally gives the NLRB a wide berth in determining whether given actions constitute unfair labor practices or are severe enough to constitute "hallmark violations" of the Act that would justify such an order. However, "a bargaining order is not a snakeoil cure for whatever ails the workplace; it is an 'extreme remedy.'" *Avecor,* 931 F.2d at 938–39 (citation omitted). This Court does not—indeed cannot—excuse the Board's failure to fulfill its legal requirements to consider certain elements and provide a reasoned explanation for its decision. *See, e.g., Peoples Gas,* 629 F.2d at 45. Where the Board fails to discharge its obligation to consider the proper factors and provide a reasoned explanation, this Court has no choice but to remand to the Board for further proceedings, if not simply invalidate the offending portions of the Board's order. Such is the case here.

■ Before entering this extreme remedy, the NLRB must carefully weigh several factors. Specifically,

> an affirmative bargaining order ... must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' § 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act.

*Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C.Cir.2000). Failure to conduct this analysis provides sufficient grounds to vacate and remand a bargaining order, regardless of whether substantial evidence supports the NLRB's conclusions that DFC engaged in "hallmark" unfair labor practices and a majority of DFC employees indicated their support of the Union by signing union authorization cards.

While the NLRB devotes the lion's share of its opinion to defending the bargaining order, it still fails to conduct the necessary analysis. Of the three factors the Board must consider, the Board and ALJ devote a reasonable amount of space to the third, and some implicit consideration of the second. The Board provides little else of substance. It mentions the first factor—whether the bargaining order impinges upon the employees' § 7 rights— and claims to consider it, but nothing resembling consideration follows. *Cf. Avecor*, 931 F.2d at 938 (a "promising topic sentence" without more does not constitute reasoned explanation).

In the place of analysis, the NLRB substitutes extensive quotation from *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). *Douglas Foods*, 330 NLRB No. 124, slip op. at 3 (quoting *Gissel*, 395 U.S. at 612–13, 89 S.Ct. 1918). Rather than follow this Court's repeated guidance on the proper analysis, the Board majority merely asserts that consideration of employees' § 7 rights is inherent in any *Gissel*-inspired analysis. *Id.* ("In sum, the *Gissel* opinion itself reflects a careful balancing of the employees' Section 7 rights 'to bargain collectively' and 'to refrain from' such activity."). This cannot do. The NLRB cannot discharge its obligation merely by citing the appropriate authority and averring that it gave proper consideration. It actually must consider the factors as they apply to the instant case, and explain the basis for its conclusions. In the instant case the Board may have devoted greater effort to satisfying this Court's demand for a reasoned explanation than in prior decisions, but it has yet to clear the bar—it is not even close.

The Board further errs by failing to account for the changes at DFC following the 1996 union election. By the time of the NLRB proceedings, DFC no longer maintained "retail" operations, and fewer than five of the employees listed on the voting list for the union election in 1996 were still in DFC's employ. Some of this turnover was no doubt due to the truck and route sales. Some also resulted from other factors unrelated to DFC's unfair labor practices. As things stand now, we question whether DFC has a labor force that would allow for the reasonable imposition of such an order, and the Board's order provides us with no answer.

■ The law is clear that the Board is not free to disregard employee turnover when issuing a bargaining order "unless it finds that the employer's practices are particularly flagrant." *Avecor*, 931 F.2d at 937. The alleged abuses must be far more drastic than those merely required to justify a bargaining order in the first place— so-called "category I" abuses as opposed to "category II" abuses. In cases, such as this, where only category II abuses are found, "the Board *must* carefully consider employee turnover." *Id.* (emphasis added). The mere assertion that DFC should not profit from its own unfair labor practices does not amount to consideration of employee turnover, let alone "careful consideration."

■ The NLRB attempts to justify its failure to consider the changed circumstances on the grounds that many of the changes resulted from the unfair labor practices at issue in this case. The NLRB opposes taking such changes into account

because an employer should not be able to rely upon unlawful, anti-union acts to defeat a bargaining order. *NLRB v. Gordon*, 792 F.2d 29, 34 (2nd Cir.1986) ("It would defy reason to permit an employer to deflect a *Gissel* bargaining order on the ground of employee turnover when that turnover has resulted from the employer's unlawful discharge[s]"). Be this as it may, the NLRB was required to consider changed circumstances no matter what their cause. As *Gissel* instructs, "effectuating ascertainable employee free choice [is] as important a goal as deterring employer misbehavior." *Gissel*, 395 U.S. at 614, 89 S.Ct. 1918. Moreover, in selecting a remedy for NLRA violations, the NLRB must select "a course that is remedial rather than punitive, and [choose] a remedy which can fairly be said to effectuate the purposes of the Act." *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1120 (D.C.Cir.1994) (quoting *Peoples Gas*, 629 F.2d at 42). The Board cannot allow its desire to stop a company from profiting from an unfair labor practice to eclipse a concern for effectuating employees' right to choose their representation.

In remanding the NLRB's decision to impose a bargaining order, we cannot help but feel a sense of *déjà vu*.

> The Board, inexplicably, has once again defied the law of this circuit and failed to offer an adequate justification for the bargaining order sanction imposed against [DFC]. We therefore find ourselves in the all-too-familiar position of having to remand this case to the Board for adequate justification of the proposed affirmative bargaining order, thus further delaying relief for the employees the Board purports to protect.

*Vincent Indus. Plastics*, 209 F.3d at 731. On no fewer than seven occasions in the past seven years alone we have remanded inadequately justified bargaining orders. *Id.*; *Flamingo Hilton–Laughlin v. NLRB*, 148 F.3d 1166 (D.C.Cir.1998); *Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972 (D.C.Cir. 1998) ("*Exxel/Atmos II*"); *Lee Lumber & Building Material Corp. v. NLRB*, 117 F.3d 1454 (D.C.Cir.1997) (per curiam); *Skyline Distrib. v. NLRB*, 99 F.3d 403 (D.C.Cir.1996); *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074 (D.C.Cir. 1996); *Exxel/Atmos I*, 28 F.3d at 1243. "Eight is enough." *Exxel/Atmos II*, 147 F.3d at 979 (Sentelle, J., concurring). *See also Caterair*, 22 F.3d at 1123 ("Five times in the past fourteen years this court has remanded such orders to the Board with a request for explanation as to why.... This case makes it an even half-dozen. We must assume the Board will deign to provide the necessary explanation at some point in order to obtain enforcement.").

Time and again this Court has been required to overturn NLRB orders that violate the explicit requirements of our precedent. "Case law in our circuit is as clear as it could be on this question. The Board, however, continues to ignore us. We continue to reverse." *Lee Lumber*, 117 F.3d at 1462. "We persist not out of pique but from a sense that it is our duty to ensure that the Board adheres to its statutory mandate." *Caterair*, 22 F.3d at 1123. The Board's consistent refusal to fulfill its legal obligation to provide sufficient justification for its bargaining orders will not prevent us from fulfilling our obligation to apply the law. So long as the Board persists on its current course we have no choice but to remand each offending order. "We reiterate [this] sentiment here, hopefully for the final time." *Exxel/Atmos I*, 28 F.3d at 1249.

## VI. Conclusion

For the reasons above, we grant the petition for review in part, and deny in part. We vacate the Board's conclusion that DFC committed unfair labor practices by selling catering trucks and routes. We

also vacate the accompanying restoration order and bargaining order, and remand to the Board for further proceedings not inconsistent with this opinion. With respect to all other issues, including those not discussed expressly herein, the petition for review is denied and the cross-petition for enforcement is granted.