# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 6, 2006      Decided February 24, 2006

No. 04-1430

COGBURN HEALTH CENTER, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

---

Consolidated with
No. 05-1017

---

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

---

*Annette A. Idalski* argued the cause for petitioner. With her on the briefs was *Kurt A. Powell. Scot A. Hinshaw* and *Susan F. Wiltsie* entered appearances.

*William M. Bernstein*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the briefs were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*,

Deputy Associate General Counsel, *Fred B. Jacob*, Supervisory Attorney, and *Gregory P. Lauro*, Attorney.

Before: SENTELLE and HENDERSON, *Circuit Judges,* and EDWARDS, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Cogburn Health Center, Inc. (also referred to by the Board as Cogburn Healthcare Center, Inc.) ("Cogburn" or "Company"), a nursing home in Mobile, Alabama, petitions this court for review of an order of the National Labor Relations Board ("Board"), and the Board cross-applies for enforcement. On July 19, 1996, the Board held a secret-ballot election to determine whether the employees in a designated bargaining unit at Cogburn desired to be represented by the United Food and Commercial Workers Union, Local 1657, AFL-CIO ("Union"). The election results indicated that 52 employees cast votes in favor of the Union, and 72 against. The Union then filed unfair labor practice ("ULP") charges with the Board, and a complaint was issued. The complaint charged that a majority of the employees in an appropriate unit at Cogburn had selected the Union as their bargaining representative by signing authorization cards; that, in April 1996, Cogburn had rejected the Union's request to bargain on behalf of the employees; that Cogburn then engaged in a campaign of ULPs designed to undermine the Union's support; that, because of the serious nature of Cogburn's ULPs, the possibility of conducting a fair rerun election was only slight; and that, in light of this situation, the rights of the employees would be best served by the Board's issuance of a bargaining order. The Board found that Cogburn had indeed engaged in widespread violations of § 8(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) (2000), including, but not limited to, unlawful surveillance, interrogations, threats,

and prohibitions on wearing Union insignias. The Board also found that the Company had discharged five Union supporters during the organizing campaign in violation of §§ 8(a)(1) and (3) of the Act, and terminated a sixth employee because of her Union activities and sympathies, and also because she gave testimony for the Union in a representation proceeding, in violation of §§ 8(a)(1), (3), and (4) of the Act. *See Cogburn Healthcare Ctr., Inc.*, 335 N.L.R.B. 1397 (2001).

To remedy these violations, the Board ordered Cogburn, *inter alia*, to cease and desist from engaging in any further unfair labor practices, post appropriate notices to advise employees of their rights under the Act, and reinstate the unlawfully discharged employees and make them whole for their losses. The Board also issued a *Gissel* bargaining order, *see NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), and held that Cogburn violated §§ 8(a)(1) and (5) of the Act by refusing to bargain with the Union on April 18, 1996, when the Union requested bargaining based on a card majority.

Substantial evidence supports the Board's determinations that Cogburn committed the cited ULPs in violation of §§ 8(a)(1), (3), and (4) of the Act. We therefore enforce the Board's order with respect to these charges. We reverse the Board's *Gissel* bargaining order, however, because the Board failed to credit Cogburn's properly raised evidence of "changed circumstances" that arose during the more than three years when the initial ULP case was pending disposition by the Board. A few more years passed during which Cogburn's motions for reconsideration languished before the Board. Ten years have now elapsed since Cogburn's alleged refusal to bargain in April 1996, and there has been substantial turnover in the employee and management ranks at Cogburn during this period. In the face of this record, the Board has offered no viable justification for an affirmative bargaining order. Under the plain law of this circuit, we reverse the Board's imposition of a *Gissel* bargaining

order.  Accordingly, we grant in part and deny in part the Board's cross-petition for enforcement, and we grant in part and deny in part Cogburn's petition for review.  The Board's order will be enforced with respect to all disputed issues, save for the *Gissel* bargaining order.

## I.  BACKGROUND

### A.  *The Union's Organizing Campaign*

During the time period relevant to our inquiry, Cogburn was a family-owned and operated nursing home providing medical care in Mobile, Alabama.  In October 1995, the Union began a campaign to organize Cogburn's full-time and regular part-time service and maintenance employees.  Over the course of the following six-to-nine months, Union organizers distributed leaflets and authorization cards to Cogburn employees who were exiting and entering Company property.  On April 18, 1996, after collecting signed authorization cards from a majority of the service and maintenance employees, the Union unsuccessfully sought to bargain with Cogburn on behalf of the employees.  The Union also petitioned the Board for a representation election covering the employees.  The Board scheduled an election for July 1996.

Throughout the spring and early summer of 1996, the Company engaged in a concerted campaign to undermine the Union's support.  Cogburn hired a "private police force" consisting of approximately 35 off-duty Mobile city police officers and installed surveillance equipment directed at the front of the facility where the Union organizers were rallying support.  The Company also required its employees to attend mock collective bargaining sessions, at which they were instructed to follow a script in which the Cogburn representative rejected every Union offer.  Several Company supervisors and Cogburn co-owner and Vice President, Steve Roberts, conducted a series of "interrogations" – conversations during which they

questioned employees about Union activities and their and other employees' feelings about the Union. Finally, during the course of the organizing campaign, six well-known Union supporters were discharged for their Union activities and sympathies.

The Board held a secret-ballot election on July 19, 1996. Of the approximately 135 eligible voters, 52 cast votes in favor of the Union, and 72 against. The Union then filed ULP charges with the Board. After a series of hearings held between March and September 1997, an Administrative Law Judge ("ALJ") found that Cogburn had committed numerous violations of the Act. The ALJ recommended, *inter alia*, that the Company be required to reinstate and grant backpay to the six discharged employees and to bargain with the Union as the exclusive representative of the employees. *Cogburn Healthcare Ctr.*, 335 N.L.R.B. at 1425-26.

## B. *The Board's Decisions*

The Board finally issued a decision on September 27, 2001, over three years after the ALJ's decision. The Board found, in agreement with the ALJ, that Cogburn committed multiple violations of § 8(a)(1) of the Act in response to the Union's organizing campaign. These violations included: coercively interrogating employees; threatening employees with loss of benefits, closure of the facility in the event of unionization, and refusal to rehire any employee who engaged in protected strike activity; telling employees that the employer would not have to bargain with the Union; threatening in simulated bargaining sessions that unionization would be futile; offering to increase wages and benefits if the Union promised not to file additional unfair labor practice charges or objections to the representation election; engaging in surveillance of employee Union activity with video cameras and a private police force; prohibiting employees from wearing clothing reflecting Union membership without permission; and permitting employees who opposed the Union to leave their work stations and handbill while prohibiting

prounion employees from doing so. *Id.* at 1399-1400. The Board also accepted the ALJ's finding that Cogburn violated §§ 8(a)(1) and (3) of the Act by discharging employees Hill, Husband, Wiggins, Langham, and Kirk, and violated §§ 8(a)(1), (3), and (4) of the Act by discharging employee Collins because of her Union sympathies and her testimony for the Union at a Board representation hearing. *See id.* at 1397.

The Board ordered Cogburn to cease and desist from the unfair labor practices found and from interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by § 7 of the Act, 29 U.S.C. § 157 (2000). Affirmatively, the Board ordered Cogburn, *inter alia*, to offer reinstatement to Hill, Husband, Wiggins, Langham, Kirk, and Collins, and make them whole for any loss of earnings and benefits they suffered as a result of their unlawful discharges. The Board also found that the pervasiveness of Cogburn's unfair labor practices placed this case in *Gissel*'s "category II," and thus rendered a fair rerun election unlikely. *Cogburn Healthcare Ctr.*, 335 N.L.R.B. at 1398-99; *see Gissel*, 395 U.S. at 614 (describing category II cases as "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes"). The Board therefore directed that the July 19 election be set aside, and that Cogburn recognize the Union and bargain upon request. *Cogburn Healthcare Ctr.*, 335 N.L.R.B. at 1403. In support of the *Gissel* bargaining order, the Board found that Cogburn violated §§ 8(a)(1) and (5) of the Act by refusing to bargain with the Union on April 18, 1996, when the Union demanded recognition and bargaining based on authorization cards from a majority of the employees in the designated unit. *Id.* at 1397.

On November 2, 2001, soon after the Board's order issued, Cogburn moved to reopen the record, citing evidence of "changed circumstances" that rendered the imposition of a

bargaining order unnecessary. Specifically, Cogburn alleged that the long delay between the unfair labor practices in 1996 and the Board's decision in 2001, as well as significant employee and management turnover, made it clear that a bargaining order was no longer justified.

On June 21, 2004, two and a half years after Cogburn filed its motion, the Board, with one member dissenting, denied the Company's motion to reopen the record. The Board first noted that Cogburn failed to comply with § 102.48(d)(1) of the Board's rules, which requires parties to state "'why [the evidence] was not presented previously.'" *Cogburn Healthcare Ctr., Inc.*, 342 N.L.R.B. No. 11, 2004 WL 1413262, at *2 (June 21, 2004) (quoting 29 C.F.R. § 102.48(d)(1)) (alteration in Board's order). The Board questioned why Cogburn "failed to show that some or all of [its] evidence . . . was not available during the [three-year] period that the case was pending before the Board on exceptions." *Id.* Without such an explanation, the Board concluded that Cogburn's motion "was untimely made." *Id.*

In addition to the alleged procedural flaw in Cogburn's motion, the Board also found that Cogburn failed to demonstrate how its additional evidence "'would require a different result.'" *Id.* at *3 (quoting 29 C.F.R. § 102.48(d)(1)). The Board reiterated its "established policy" that the propriety of a bargaining order is assessed only "as of the time that the [employer] committed the violations," and not at the time of the Board's order. *Id.* The Board also pointed out that, even taking into account the post-violation "changed circumstances" alleged by Cogburn, two supervisors found to have committed various unfair labor practices were still employed by the Company at the time of Cogburn's motion, and the Company did not claim "that there has been any significant change in the family ownership group, . . . other than the death of [former co-owner and Vice President,] Steve Roberts." *Id.* Finally, the Board declared that

the "passage of time does not render a bargaining order inappropriate." *Id.*

On August 5, 2004, Cogburn filed a second motion for reconsideration, claiming that additional employee and management turnover and the passage of time justified vacating the Board's bargaining order. The Board denied Cogburn's motion. The Company then filed a timely petition for review and the Board filed a cross-application for enforcement of its order.

## II. ANALYSIS

### A. *Unfair Labor Practices*

The Board's findings that Cogburn committed the cited violations of §§ 8(a)(1), (3), and (4) are "'supported by substantial evidence on the record considered as a whole.'" *Palace Sports & Entm't, Inc. v. NLRB*, 411 F.3d 212, 220 (D.C. Cir. 2005) (quoting 29 U.S.C. § 160(e)-(f) (2000)). The ALJ's discussion of the evidence, proposed findings, and recommended remedies, nearly all of which were adopted by the Board, are clearly unassailable under the applicable standard of review. We therefore have no grounds upon which to second-guess the Board's determinations with respect to the §§ 8(a)(1), (3), and (4) ULPs.

### B. *The* Gissel *Bargaining Order*

#### 1. Timeliness of Cogburn's Motion for Reconsideration

Shortly after the Board issued its decision in September 2001, Cogburn moved to reopen the record. The Company argued that the Board should reconsider its decision to impose a *Gissel* bargaining order due to "changed circumstances" that arose during the several years when the ULP case was pending disposition. The Board denied the Company's motion largely on the ground that it was untimely. Cogburn contends that the Board erred in refusing to address its motion and credit its

evidence of changed circumstances on this procedural ground. We review the Board's decision not to reopen the record for an abuse of discretion. *E. Carolinas Broad. Co. v. FCC*, 762 F.2d 95, 103 (D.C. Cir. 1985).

Citing its regulations, the Board contends that Cogburn neglected to "'state [why] the additional evidence sought to be adduced . . . was not presented previously.'" Br. for NLRB at 56 (quoting 29 C.F.R. § 102.48(d)(1)). The Board's finding on this score is simply wrong. In its motion to the Board, the Company stated:

> Simply put, Cogburn cannot be expected to have presented evidence of substantial employee turnover and management changes which did not exist when this matter initially was presented to the Board, more than three (3) years ago. Indeed, the longer the Board delayed in issuing its decision, the more changes occurred during the day to day operations at Cogburn. As such, Cogburn now should be permitted to introduce evidence of changed circumstances.

Cogburn Healthcare Center Inc.'s Request to Reopen the Record and for Reconsideration, *Cogburn Healthcare Ctr., Inc.* (Nov. 1, 2001) at 8, Joint Appendix ("J.A.") 30 (hereinafter "Cogburn Motion"). It is plain that Cogburn explained that it did not present evidence of changed circumstances when it filed its 1998 exceptions to the Board because those changes took place over the ensuing three years.

The Board argues that Cogburn could have alerted the Board to the "changed circumstances" *during* the three-year interval between the ALJ's decision and the Board's order. To support this claim, the Board relies on the decision in *NLRB v. U.S.A. Polymer Corp.*, 272 F.3d 289 (5th Cir. 2001). The Fifth Circuit noted in *Polymer* that "[t]he Board's procedural rules permit an employer to submit a motion to reopen the record after the ALJ's decision but before the Board has ruled." *Id.* at 295.

The decision added that "[t]he Board is entitled to assume, in the face of the parties' silence, that the facts as initially presented continue to adequately describe the employer's workforce." *Id.* at 296. But *Polymer* also makes it clear that "there is no clear procedural vehicle for such a motion." *Id.* at 295. In our view, this last point is the most telling. Nothing in the Board's rules required Cogburn to advise the Board of every changed circumstance in its business operation and workforce between the date of the ALJ's decision and the Board's final disposition of the case. And we will not infer such a requirement.

The changed circumstances here were gradual, incremental, and cumulative. There was no single event at Cogburn which, alone, gave clear evidence of "changed circumstances." Absent a Board rule requiring it, Cogburn had no reason to think that it was obliged to file a motion on every occasion of employee turnover. Cogburn acted reasonably under the circumstances and the Board abused its discretion in rejecting Cogburn's motion as untimely.

2. The Board's Treatment of Cogburn's Evidence of "Changed Circumstances"

Despite deeming Cogburn's motion "untimely," the Board nonetheless went on to consider Cogburn's claim that "changed circumstances" now "require a different result," or, more precisely, a different remedy. In its motion, Cogburn asserted that a *Gissel* bargaining order was no longer necessary, because, in the five years since the organizing campaign and election, there had been substantial changes at the Company. Examples of these changes included the following information: (1) only 44% of Cogburn's 169 designated bargaining unit employees in 2001 were employed during the Union election campaign; (2) of the 82 employees that signed authorization cards, only 25 were still employed in 2001; (3) there had been significant management turnover, including the death of the Company's co-owner and Vice President, Steve Roberts, who was identified by

the Board as a major perpetrator of Cogburn's ULPs, and the replacement of Company co-owner and Administrator, Suzanne Hughes, who was also responsible for various ULPs; and (4) subsequent to the ALJ's decision in 1998, no ULP charges had been filed. *See* Cogburn Motion at 2, 5-6, J.A. 24, 27-28. Based on these developments and the long passage of time between the alleged ULPs and the issuance of the bargaining order, Cogburn argued that it was now possible for the Board to hold a fair and impartial election. *Id.* at 8, J.A. 30.

This court has, on numerous occasions, directed the Board to provide a reasoned analysis when considering the imposition of a bargaining order. *See, e.g., Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1065 (D.C. Cir. 2001); *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000); *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1170 (D.C. Cir. 1998); *Avecor, Inc. v. NLRB*, 931 F.2d 924, 937-39 (D.C. Cir. 1991). The required analysis must contain "an explicit balancing of three considerations: (1) the employees' § 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act." *Vincent Indus.,* 209 F.3d at 738. Furthermore – and most relevant here – we have made it clear that the Board must consider the appropriateness of a bargaining order *at the time the order is issued*. *See Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1079 (D.C. Cir. 1996); *Avecor*, 931 F.2d at 937.

The Board may have undertaken a thorough *Gissel* analysis with respect to the information it had at the time of its original order in 2001. *See Cogburn Healthcare Ctr.*, 335 N.L.R.B. at 1398-1401. But its analysis failed when Cogburn proffered evidence of "changed circumstances." In response to Cogburn's motion to reopen the record, the Board stated:

> Although [Cogburn] has recited changed circumstances as grounds for rescinding the *Gissel* order, the Board's established policy is to assess the propriety of a bargaining order as of the time that the respondent committed the violations. We therefore conclude that [Cogburn]'s motion does not comply with the Board's Rules.

*Cogburn Healthcare Ctr.*, 2004 WL 1413262, at \*3. The Board's decision on this point was wrong as a matter of law. As we explained in *Charlotte Amphitheater*:

> Circumstances . . . may change during the interval between the occurrence of the employer's unfair labor practices and the Board's disposition of a case. There is, therefore, the obvious danger that a bargaining order that is intended to vindicate the rights of past employees will infringe upon the rights of the current ones to decide whether they wish to be represented by a union. Therefore, we have repeatedly instructed the Board to determine the appropriateness of a *Gissel* bargaining order in light of the circumstances existing *at the time it is entered*.

82 F.3d at 1078 (emphasis added). "If the Board continues to disagree with us, it is of course free to seek Supreme Court review." *Id.* at 1079. But "[s]o long as the Board persists on its current course we have no choice but to remand each offending order." *Douglas Foods*, 251 F.3d at 1067.

The Board points out that in *Charlotte Amphitheater*, this court stated that "'the Board has no affirmative duty to inquire whether employee turnover or [the] passage of time has attenuated the effects of earlier unfair labor practices.'" Br. for NLRB at 53 (quoting *Charlotte Amphitheater*, 82 F.3d at 1080). But our decision in *Charlotte Amphitheater* also states that "an employer must be allowed the opportunity to introduce evidence of changed circumstances that would mitigate the need for a bargaining order." *Charlotte Amphitheater*, 82 F.3d at 1080.

There is no doubt here that the Board was obligated to consider thoroughly Cogburn's timely motion to reopen the record.

The little bit that the Board offered in a defense of the proposed *Gissel* bargaining order falls far short of what is necessary. With respect to Cogburn's claims of management turnover – the death of co-owner and Company Vice President, Steve Roberts, and the departure of co-owner and Company Administrator, Suzanne Hughes – the Board responded that Hughes's replacement, Prentiss Smith, played a role in illegally thwarting the Union's organizing drive in 1996, and added that Dietary Manager, Sonya O'Shea, who was found to have interrogated three employees and threatened other employees with facility closure, had been rehired after a two-year absence from the Company. The Board also claimed that Cogburn "d[id] not contend that there has been any significant change in the family ownership group, . . . other than the death of Steve Roberts." *Cogburn Healthcare Ctr.*, 2004 WL 1413262, at *3. The Board said nothing about employee turnover. Rather, in response to Cogburn's evidence of the dwindling percentage of voting employees still employed by the Company (44%) and the small percentage of those employees still with the Company who signed authorization cards (30%), Board counsel argued that 44% is a "substantial percentage" which constitutes a "remaining core of employees" sufficient to support a bargaining order. Br. for NLRB at 58 (quotation marks omitted).

The Board's rote treatment of Cogburn's evidence is entirely unconvincing. For one thing, as noted above, the Board simply ignored the evidence of employee turnover. This error alone dooms the Board's order, for we have made it clear that "the Board is not free to disregard employee turnover when issuing a bargaining order." *Douglas Foods*, 251 F.3d at 1066; *see also Avecor*, 931 F.2d at 937.

Moreover, the Board's cursory review of the change in Company management hardly reflects reasoned decisionmaking to which we might otherwise defer. The Board summarily discounted the departure of two of the most prominent executives of the Company, who were significantly responsible for approximately 15 ULPs, five of the 15 instances of unlawful interrogations, and four of the six discharges. The Board undertook no analysis of the effect these changes might have had on the employees and, instead, merely concluded that, because two management officials still remained, a bargaining order was the appropriate remedy. And the Board's suggestion that Cogburn "does not contend that there has been any significant change in the family ownership group," without more, proves nothing. The Board never made the ownership group the main culprit for the ULPs; rather the Board's focus in the ULP case was on the *management* group, and most of the cited managers are no longer with the Company.

Finally, the Board failed to address Cogburn's perfectly reasonable argument that the five-year span of time between the ULPs and the Board's decision warranted a second look at the need for a bargaining order. The Board stated, without explanation, that the "passage of time does not render a bargaining order inappropriate." *Cogburn Healthcare Ctr.*, 2004 WL 1413262, at *3. This is a specious argument, both as a matter of commonsense and in light of the governing case law. Time *is* a factor that should be considered by the Board, along with employee and management turnover. *See Flamingo Hilton-Laughlin*, 148 F.3d at 1171; *Charlotte Amphitheater*, 82 F.3d at 1078. As we noted in *Peoples Gas System, Inc. v. NLRB*:

> [W]ith the passage of time, any coercive effects of an unfair labor practice may dissipate, employee turnover may result in a work force with no interest in the Union, and a fair

> election might be held which accurately reflects uncoerced employee wishes as of the present time.

629 F.2d 35, 47 (D.C. Cir. 1980). This matter is now 10 years old, largely because of the Board's extraordinary delays in case processing. In this situation, it is the height of chutzpah for the Board to pronounce that the passage of time is irrelevant.

## C. *The Appropriate Remedies*

There is little question that the Board's order to reinstate and make whole the six discharged employees is an appropriate remedy, as is the Board's cease and desist order. The Board's affirmative bargaining order is another matter, however. The law of this circuit, which the Board flouted, compels reversal of the *Gissel* bargaining order. In some cases involving a disputed bargaining order, we will remand the case to the Board for further consideration. In this instance, however, a remand would be fruitless, because the record in this case cannot support a bargaining order.

Cogburn tells us that, were we to remand the case, the Board would find that, at least as of 2004, only 21 of the 82 members of the proposed bargaining unit who signed authorization cards are still employed by the Company. It would also learn that, as of 2004, Steve Roberts and Suzanne Hughes were no longer running the day-to-day operation of the Company. And it would learn that Prentiss Smith, whose presence the Board found significant in its denial of Cogburn's first motion to reopen the record, has been replaced as the acting administrator. We need not credit these additional "changed circumstances," however, in order to justify a reversal in this case.

As noted above, the Board's decision rejecting Cogburn's motion to reopen the record gave no hint of reasoned decisionmaking and it was wrong as a matter of law. Indeed, the Board made it clear that it had no intention of following the law

of this circuit. The telling point here is that more than a decade has passed since a majority of employees in the unit signed authorization cards, making it nearly impossible for the Board to determine whether a majority of today's workforce at Cogburn desires Union representation. At this late stage, only a new election can accomplish that goal.

### III. CONCLUSION

For the reasons articulated herein, we grant in part and deny in part Cogburn's petition for review, and we grant in part and deny in part the Board's cross-application for enforcement. We affirm the Board's substantive conclusions and enforce the Board's remedial order insofar as it requires the Company to cease and desist all unfair labor practices, post notices, and make whole and offer employment to former Cogburn employees Hill, Husband, Wiggins, Langham, Kirk, and Collins. Finally, we hold that there is simply no basis in this record for an affirmative bargaining order or the Board's finding that Cogburn failed to bargain in violation of §§ 8(a)(1) and (5).