# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 17, 2021　　　　　Decided May 11, 2021

No. 20-1090

RAV TRUCK AND TRAILER REPAIRS, INC. AND CONCRETE
EXPRESS OF NY, LLC,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 20-1124

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Aaron T. Tulencik* argued the cause for petitioners. With
him on the briefs was *Ronald L. Mason.*

*Gregoire Sauter*, Attorney, National Labor Relations
Board, argued the cause for respondent. With him on the brief
were *Peter B. Robb*, General Counsel, *Alice B. Stock*, Deputy
General Counsel, *Ruth E. Burdick*, Acting Deputy Associate
General Counsel, *David Habenstreit*, Assistant General
Counsel, and *Julie Broido*, Supervisory Attorney.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves a petition for review filed by RAV Truck and Trailer Repairs, Inc. ("RAV") and Concrete Express of New York, LLC ("Concrete Express"), as a single employer (collectively, "Petitioner" or the "Company"), challenging a decision and order issued by the National Labor Relations Board ("Board"). A complaint was filed with the Board alleging that the Company had violated sections 8(a)(3) and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(3) and (1), by discharging one employee, laying off another employee, and closing RAV because employees engaged in union activity. Following a hearing before an Administrative Law Judge ("ALJ"), the Board reviewed the case and issued a decision and order finding that Petitioner had committed the unfair labor practices as alleged. The Board ordered Petitioner to cease and desist from the unfair labor practices; to offer the separated employees reinstatement to their former jobs or substantially equivalent positions; to make the separated employees whole for any loss of earnings or benefits; to bargain with the Union upon request; and to "reopen and restore the business operation of [RAV] as it existed on May 14, 2018." *See RAV Truck & Trailer Repairs, Inc.*, 369 N.L.R.B. No. 36, at 1, 16-17, 2020 WL 1283464, at *1, *3 (Mar. 3, 2020) ("*RAV*").

In its petition for review, the Company claims that one employee was discharged because he lacked proper work authorization, not because of his pro-union activity. The Company additionally claims that another employee was laid

off and the RAV auto repair shop operation was closed because of RAV's financial problems and the loss of its lease, not in retaliation for or to chill union activities. And Petitioner also argues that the Board abused its discretion in declining to reopen the record to include a tax return that allegedly demonstrated RAV's financial losses. Finally, Petitioner argues the Board's remedial order is impermissibly punitive and cannot be enforced. The Board cross-petitions for enforcement of its order.

Substantial evidence supports the Board's conclusion that Petitioner committed unfair labor practices by discharging one employee and laying off another. We therefore deny the petition for review with respect to those findings and enforce the Board's reinstatement and make-whole remedies. However, we remand the case for further consideration regarding whether Petitioner committed an unfair labor practice by closing RAV. In February 2018, the Company's lease for the space in which it had housed the RAV auto repair operation was terminated. The loss of this work location had nothing to do with any union organizing campaigns. Following the expiration of the lease, the Company moved RAV to an unsuitably small, temporary space which the Company used to finish repairs from the previous location. The Company then shut down RAV for good. Given this record, "[w]e cannot decipher . . . how the Board determined" that the closure of RAV constituted an unfair labor practice. *NBCUniversal Media, LLC v. NLRB*, 815 F.3d 821, 823 (D.C. Cir. 2016).

We also remand the Board's order that Petitioner reopen and restore RAV's business operation as it existed on May 14, 2018. The temporary space into which the Company moved was covered by a month-to-month lease that ended on May 31, 2018. The space was neither adequate in size nor properly registered under New York law to accommodate a third-party

repair shop. The Board did not find that the Company intended to reopen RAV in a new location. The Board's decision does not purport to explain how restoration is even "factually possible" in these circumstances. *Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1064 (D.C. Cir. 2001).

On remand, the Board must address two issues. First, as noted above, the Company lost the lease for the space in which it had housed RAV, and the termination of the lease had nothing to do with any union organizing campaigns. How then can the Board's determination that the Company closed RAV for the purpose of chilling union activity be squared with the clear evidence that the RAV operation was shut down because of the termination of the Company's lease for the space in which RAV was housed? Second, even if the Company's closure of RAV foreseeably had chilling effects, *see Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 275-76 (1965), what legal authority allows the Board to compel the restoration of a company operation that no longer exists and for which there is no adequate space to house the operation within any of the company's existing facilities? *See NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 121-22 (2d Cir. 2001) (restoration order held to be unduly burdensome because company did not have enough space to accommodate the disputed work operation).

## I. BACKGROUND

### A. Statutory Background

The NLRA provides that an employer commits an unfair labor practice if it "discourage[s] membership in any labor organization" "by discriminat[ing] in regard to hire or tenure or employment or any term or condition of employment." 29 U.S.C. § 158(a)(3). An employer who violates section 8(a)(3)

also violates section 8(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" their statutory rights. *See* 29 U.S.C. § 158(a)(1); *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 39 (D.C. Cir. 2020). Section 10(c) of the Act authorizes the Board, upon finding an unfair labor practice, "to take such affirmative action . . . as will effectuate the policies of" the Act. 29 U.S.C. § 160(c).

### B. Factual Background

Christopher Trentini is the sole owner and officer of both Concrete Express and RAV. The parties agree that the two entities constitute a single employer for purposes of this case**.**

Concrete Express manufactures, sells, and delivers concrete. Its principal place of business is 2279 Hollers Avenue, Bronx, New York ("Hollers Avenue"). That location consists primarily of outdoor space for storing sand, gravel, and other materials. Concrete Express parks its trucks overnight at 3771 Merritt Avenue, Bronx, New York ("3771 Merritt"), less than half a mile away. Concrete Express's drivers pick up their trucks at 3771 Merritt before loading them at Hollers Avenue and proceeding to delivery sites.

RAV performed repairs on trucks owned by various companies, including Concrete Express. Until February 2018, RAV leased a garage at 38 Edison Avenue, Mount Vernon, New York. That location is a 4,000 square foot four-bay garage with an 8,000 square foot fenced-in outdoor area. The Edison Avenue location was listed as RAV's address on an "official business certificate" issued by the New York State Department of Motor Vehicles. Joint Appendix ("J.A.") 362. That document certified RAV as a registered public, third-party repair shop.

Petitioner claims that in February 2018, the owner of the Edison building notified Trentini that RAV's lease would be terminated. The next month, RAV moved to 3773 Merritt Avenue, Bronx, New York ("3773 Merritt"). Although RAV and Concrete Express had nominally different street addresses at 3773 and 3771 Merritt Avenue, those addresses constituted the same building with a single open internal space. The entire building is approximately 7,500 square feet. However, the portion of 3773 Merritt that RAV leased consisted of only 600 square feet of garage space and one garage door.

Petitioner's lease for 3773 Merritt states that the location is a "[w]arehouse space for the repair of commercial vehicles to finish remaining repairs from previous location." J.A. 278. The lease term was listed as "Month to Month[,] beginning March 1, 2018 and ending May 31, 2018." *Id.* Petitioner claims that at the time of the move, RAV had only two scheduled third-party repairs that were not completed. Petitioner also alleges that 3773 Merritt lacked features required by New York law for third-party motor vehicle repair shops, such as sprinklers, fire alarms, standpipes, and oil and water separators.

After the move, RAV's employees primarily worked at Merritt Avenue. One RAV employee testified that he would also visit the Hollers Avenue location to service vehicles two to four times a week.

*1. Union Activities at Concrete Express*

On April 19, 2018, Teamsters Local 456, International Brotherhood of Teamsters (the "Union") petitioned to represent a unit of "drivers and mechanics" employed at Hollers Avenue. J.A. 4**.** The Board conducted an election on May 10, 2018.

The Board later found, in a related case, that Petitioner committed several unfair labor practices in response to the Union's organizing at Concrete Express. *See RAV*, 369 N.L.R.B. No. 36, at 1 n.3; *see also Concrete Express of NY, LLC*, Case No. 02-CA-220381, 2019 WL 7370429 (N.L.R.B. Div. Judges Dec. 27, 2019), *summarily adopted absent exceptions*, 2020 WL 1182469 (N.L.R.B. Feb. 28, 2020) ("*Concrete Express*"). In the week prior to the election, Trentini threatened three employees with discharge if they voted for the Union, interrogated two employees about union activities, impliedly promised an employee a new truck if he refrained from union activities, and convened a staff meeting in which his wife Donna, Concrete Express's financial manager, told employees that she would close the business if they elected the Union. Hours after the May 10 election, Petitioner told employees they were no longer allowed to park on company premises, which the Board found constituted unlawful retaliation.

The election resulted in a vote of 4-3 in favor of the Union, plus one determinative ballot challenged by the Union on the grounds that the voter was not a bargaining unit employee. The Board found the challenged ballot admissible and ordered it to be opened and counted. Because Concrete Express had committed multiple unfair labor practices between the filing of the petition and the election, the Board also ordered a rerun election in the event that a majority of ballots were not cast for the Union.

*2. Union Activities at RAV*

Petitioner employed Jorge Alberto Valencia Medina and Victor Gonzalez as mechanics at RAV. As of March 2018, both Valencia and Gonzalez were working at 3773 Merritt, and both

men repaired vehicles owned by Concrete Express and third parties. RAV had hired Gonzalez in August 2016. Valencia was originally on Concrete Express's payroll but was moved to RAV's payroll in May 2018.

Gonzalez heard about the Union from Concrete Express drivers, who picked up their trucks at 3771 Merritt in the mornings. A Concrete Express driver told Gonzalez that unionization would result in "better benefits." J.A. 125.

On May 14, 2018, Gonzalez met with a Union representative who gave him two union authorization cards. Gonzalez and Valencia signed the cards and Gonzalez returned them to the representative. Later that day, the Union filed with the Board and emailed Trentini a petition to represent the mechanics of a company called "RAV Trucking Corporation." *See* J.A. 431. "RAV Trucking Corporation" is a separate entity owned by Trentini. It does not operate at 3771 Merritt and does not employ any mechanics. However, the Union's petition listed the employer's address as 3771 Merritt Avenue, the unit size as 2 employees, and the unit description as "[a]ll full-time and regular part-time mechanics employed by the Employer." *Id.*

The next day, on May 15, 2018, Trentini approached Gonzalez and Valencia, together with his daughter Alexis and an employee from a nearby tire shop who served as an interpreter. Trentini said he had heard a rumor that Immigration and Customs Enforcement ("ICE") agents were in the area and asked if Gonzalez and Valencia had papers authorizing them to work in the United States. Gonzalez responded affirmatively, but Valencia said no. Trentini then said he could not give Valencia any more work. Alexis asked Valencia to sign a letter stating he was resigning, but Valencia refused. Trentini referred to the document as a "termination letter" and

acknowledged that it had been prepared in advance of the meeting. Trentini also admitted that ICE agents had been in the area before and that he had previously suspected Valencia was undocumented but took no action. The Union filed an unfair labor practice charge against Petitioner the next day, citing Valencia's discharge.

Less than one week later, on May 21, 2018, Trentini told Gonzalez it was his last day, because he was closing RAV for lack of work. However, Gonzalez later testified that his workload had not changed since RAV moved to 3773 Merritt. Petitioner's payroll records indicate that Gonzalez and Valencia regularly worked overtime in excess of 40 hours a week, including during payroll periods immediately preceding their layoff and discharge. A few hours after Gonzalez was laid off, the Union filed a second representation petition, this time correctly identifying RAV as the employer of the sought-after unit.

On May 22, 2018, the Union filed a third petition for the same mechanics unit, but now named RAV and RAV Trucking Corporation as a single/joint employer. On May 31, 2018, Petitioner filed a statement of position in the underlying representation case. Petitioner asserted that "[b]efore this petition was filed, there was another Mechanic who was employed but he was terminated/quit because he was an illegal alien . . . . [T]he remaining Mechanic . . . advised the Company he is legal and has his papers. However, he was laid off from work and has never presented the papers showing he can lawfully work in the United States." J.A. 394. Later that same day, Petitioner's counsel informed the Board and the Union via email that RAV "will be shutting its doors. . . . It is now officially out of business." J.A. 415.

**C. Procedural History**

The case was tried before an ALJ in October and November 2018. The Board's General Counsel argued that Petitioner violated sections 8(a)(3) and (1) by discharging Valencia, laying off Gonzalez, and closing RAV in retaliation for employees' union activity. The General Counsel also argued that Petitioner violated section 8(a)(1) by threatening employees with arrest or deportation and business closure because they supported the Union.

At the hearing, Trentini claimed he discharged Valencia due to Valencia's lack of work authorization and laid off Gonzalez and closed RAV due to RAV's financial decline and loss of lease. But his testimony regarding RAV's financial situation was confusing. Trentini denied familiarity with RAV's payroll or financial accounting. And he provided shifting testimony on how Concrete Express paid RAV for services rendered. The ALJ found that "Trentini's testimony on [that] subject was not credible," and also found "his overall credibility diminished by a willingness to reverse his testimony as the defense required." *RAV*, 369 N.L.R.B. No. 36, at 5 & n.9.

As evidence of RAV's financial decline, Petitioner sought to introduce an undated, unsigned 2017 federal tax return. The ALJ conditionally admitted the unsigned return as a business record, requiring Petitioner to replace it with "the actual signed tax return." J.A. 210. After the hearing, Petitioner submitted a different document which was nearly identical to the unsigned 2017 federal tax return, but was signed and dated January 14, 2019 and bore the name of a different tax preparer. The ALJ found the unsigned 2017 return to be unreliable hearsay and declined to rely on it as evidence of RAV's financial situation.

In July 2019, the ALJ issued a decision and recommended order. The ALJ found that RAV and Concrete Express constituted a single employer. The ALJ dismissed the allegation that Petitioner violated section 8(a)(1) of the Act by threatening employees with arrest or deportation and business closure. However, the ALJ concluded that Petitioner violated sections 8(a)(3) and (1) of the Act by discharging Valencia, laying off Gonzalez, and closing RAV.

Regarding RAV's closure, the ALJ looked to the standards laid out in *Darlington*. *See* 380 U.S. at 275-76. First, the ALJ found that RAV was closed for antiunion reasons. The ALJ cited evidence that RAV "was not winding down" and instead closed "because [Trentini] received representation petitions." *RAV*, 369 N.L.R.B. No. 36, at 12. Next, the ALJ explained that the "far more difficult issues [were] whether [Petitioner] closed RAV for the purpose of chilling the union activity of employees still employed by Concrete Express and whether such a chilling effect was realistically foreseeable under the circumstances." *Id.* The ALJ acknowledged that "the record lacks certain evidence that is characteristic" of unlawful partial closure cases, including "evidence that [Petitioner] discussed RAV's closure with Concrete Express employees or engaged in other unlawful conduct which might have established a coercive context at Concrete Express more conducive to an inference of chilling intent and foreseeability." *Id.* at 13. The ALJ nevertheless found RAV's closure was unlawful, citing the proximity of RAV and Concrete Express's workers and the fact that Petitioner was contesting Concrete Express's election results at the time it closed RAV.

The ALJ recommended that the Board order Petitioner, *inter alia*, to cease and desist from the unfair labor practices found; to offer Valencia and Gonzalez reinstatement to their former jobs or substantially equivalent positions; to make

Valencia and Gonzalez whole for any loss of earnings or benefits; to bargain with the Union upon request; and to "reopen and restore the business operation of RAV as it existed on May 14, 2018." *See id.* at 16-17. Petitioner argued it could not restore RAV because it had been "operat[ing] an unregistered repair shop in violation of New York law" when it temporarily used the space at 3773 Merritt to finish up some third-party repairs. *See id.* at 16. The ALJ dismissed this argument as "opportunistic and inequitable," and noted that Petitioner had not provided evidence that securing a new location or retrofitting the Merritt location would be unduly economically burdensome. *See id.*

Petitioner excepted to several of the ALJ's conclusions and filed a motion to reopen the record to include the version of the 2017 tax return signed and dated January 14, 2019. In March 2020, the Board adopted the ALJ's rulings, findings, and conclusions, and issued a modified version of the ALJ's proposed order. The Board stated perfunctorily that its analysis of RAV's closure relied on the evidence cited by the ALJ as well as "the unfair labor practices found in" the *Concrete Express* adjudication. *Id.* at 1 n.2. The Board also denied Petitioner's motion to reopen the record.

## II. ANALYSIS

### A. Standard of Review

"We will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *Int'l Longshore & Warehouse Union v. NLRB*, 890 F.3d 1100, 1107 (D.C. Cir. 2018) (citation omitted). "The Board's findings of fact are 'conclusive' if supported by substantial

evidence." *Id.* (quoting 29 U.S.C. § 160(e)). "That said, while our review is deferential, we will not rubber stamp Board decisions, and we will remand where a Board order reflects a lack of reasoned decisionmaking." *Tramont Mfg., LLC v. NLRB*, 890 F.3d 1114, 1119 (D.C. Cir. 2018) (alterations, citations, and internal quotation marks omitted).

We review the Board's denial of a motion to reopen the record for abuse of discretion. *See Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1285 n.10 (D.C. Cir. 1999). We will not overturn the Board's ruling "unless it clearly appear[s] that the new evidence would compel or persuade to a contrary result." *Id.* (alteration in original) (citation and internal quotation marks omitted); *see also Napleton*, 976 F.3d at 39.

Finally, we will not disturb a remedy ordered by the Board "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *King Soopers, Inc. v. NLRB*, 859 F.3d 23, 30 (D.C. Cir. 2017) (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964)).

## B. Discharge of Valencia

The Board applies the *Wright Line* burden-shifting framework "to determine whether an unlawful motive underlay an adverse action taken by an employer." *See Napleton*, 976 F.3d at 40 (citing *Wright Line*, 251 N.L.R.B. 1083, 1083 (1980)); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 402-04 (1983) (upholding the *Wright Line* framework), *abrogated in other part by Dir., Off. of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 276-78 (1994). Under this framework, "the Board's General Counsel must show: (1) that the employee engaged in protected activity; (2) that the employer knew about that

activity; and (3) that the protected activity was a motivating factor in the employer's decision to take adverse action." *DHSC, LLC v. NLRB*, 944 F.3d 934, 938 (D.C. Cir. 2019) (citation and internal quotation marks omitted). The Board may rely on circumstantial evidence to determine the employer's motives. *See Great Lakes Chem. Corp. v. NLRB*, 967 F.2d 624, 627 (D.C. Cir. 1992). Such circumstantial evidence may include the timing of alleged discriminatory action, disparate treatment of employees involved in union activity, and an employer's additional contemporaneous violations of the Act. *See Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1101 (D.C. Cir. 2019).

"If the General Counsel meets [this] initial burden, then 'the burden of persuasion shifts to the [employer] to show that it would have taken the same action in the absence of the unlawful motive.'" *Napleton*, 976 F.3d at 40 (second alteration in original) (quoting *Novato*, 916 F.3d at 1101)). "If the Board concludes . . . that the employer's purported justifications for adverse action against an employee are pretextual, then the employer fails as a matter of law to carry its burden at the second prong of *Wright Line*." *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 219 (D.C. Cir. 2016) (citing *Rood Trucking Co.*, 342 N.L.R.B. 895, 898 (2004)).

Given the record in this case, we have no trouble in concluding that substantial evidence supports the Board's finding that Petitioner violated sections 8(a)(3) and (1) by discharging Valencia. Valencia and Gonzalez indisputably engaged in protected activity by signing union authorization cards on May 14, 2018. The Board reasonably concluded that Petitioner knew about this activity because the Union emailed a petition to Trentini later that same day, albeit addressed to "RAV Trucking Corporation" instead of "RAV Truck & Trailer" and with an address listed as 3771 Merritt, rather than

3773 Merritt. Trentini owned both entities and only RAV employed mechanics. Furthermore, the petition listed the unit as consisting of two mechanics, and RAV employed two mechanics at the time. Given the circumstances, the Board reasonably inferred that Petitioner knew at least one of RAV's two mechanics had signed an authorization card.

Substantial evidence also supports the Board's finding that Valencia's pro-union activity was a motivating factor in Petitioner's decision to discharge him. Petitioner discharged Valencia less than twenty-four hours after the Union filed its first petition. This timing supports an inference of unlawful motive. *See Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 97, 99 (D.C. Cir. 2000) (finding unlawful motive where employer discharged employee on same day that union asked for recognition). Furthermore, Trentini admitted that Valencia's termination letter was prepared before he was questioned about his immigration status. This suggests that Trentini may have used information he already knew about Valencia's status as pretext for discharging Valencia. Substantial evidence supports the Board's finding that the General Counsel satisfied the first prong of the *Wright Line* test.

The Board likewise reasonably found that Petitioner's proffered reason for discharging Valencia was pretextual. Petitioner claims it would have discharged Valencia regardless of union activity because Valencia lacked work authorization. This claim rests on Trentini's testimony, which the ALJ and the Board concluded was of "diminished" credibility. *RAV*, 369 N.L.R.B. No. 36, at 5 n.9. Petitioner does not challenge the Board's credibility determination on appeal.

Trentini claimed he heard a "rumor that ICE was in the area" from a nearby business owner but did not specify when

the conversation took place or provide any other details. *See* J.A. 254.1. There is no evidence that Trentini had ever checked an employee's work authorization in the past, even though he testified that ICE agents had "been in the area before." *Id.*; *see also* J.A. 117 (testifying that he did not require applicants to submit documents establishing work authorization). Trentini also admitted that he had heard about Valencia's undocumented status prior to May 15, 2018 but had not taken any action. *See* J.A. 256 ("There might have been a suspicion, but we didn't bother it. I mean, you know, he's working, let him work."). However, Petitioner verified the status of Gonzalez and Valencia the day after receiving the Union's first petition. Substantial evidence supports the Board's finding that Petitioner used Valencia's immigration status as pretext to discharge him in retaliation for employees seeking union representation.

The Company's arguments to the contrary are unconvincing. Petitioner complains that the Board offers "no tangible record evidence" that Trentini was aware of Union activity on May 15, 2018, *see* Br. of Pet'r at 16, but the law is clear that the Board may rely on circumstantial evidence. And, for the reasons explained above, the evidence strongly supports the Board's judgment.

### C.  Layoff of Gonzalez

The Board also adopted the ALJ's conclusion that Petitioner violated sections 8(a)(3) and (1) of the Act by laying off Gonzalez. The Board held that Gonzalez's layoff was unlawful under *Darlington*, because RAV's closure was unlawful and Petitioner attributed Gonzalez's layoff to that closure. In the alternative, the Board held that Gonzalez's layoff was unlawful under *Wright Line*. Because the case is being remanded for the Board to reconsider the issue of RAV's

closure, we will only consider the Board's *Wright Line* analysis.

It is clear, under the first stage of *Wright Line*, that the Company unlawfully laid off Gonzalez because of Gonzalez and Valencia's protected activities. The analysis for Gonzalez mirrors that of Valencia. Gonzalez "engaged in protected activity" by signing a union authorization card on May 14, 2018; it is reasonable to infer that Petitioner "knew about that activity" because of the Union's May 15, 2018 petition; and Petitioner laid off Gonzalez a week later, suggesting that "the protected activity was a motivating factor in the employer's decision to take adverse action." *See DHSC*, 944 F.3d at 938 (citation omitted); *see also Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 936 (D.C. Cir. 2011) (finding unlawful motive where employee's discharge came only days after manager observed him at pro-union rally).

At the second stage of the *Wright Line* analysis, "the employer fails as a matter of law to carry its burden" if the Board finds "that the employer's purported justifications for adverse action against an employee are pretextual." *Ozburn-Hessey*, 833 F.3d at 219 (citing *Rood Trucking Co.*, 342 N.L.R.B. at 898). An employer's "shifting explanations for terminating" an employee "undermine [the employer's] nondiscriminatory explanation for that adverse action." *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 105 (D.C. Cir. 2003) (citation omitted). In this case, Petitioner offered inconsistent reasons for Gonzalez's layoff. Trentini told Gonzalez on May 21, 2018 that he was being let go because RAV was closing due to lack of work. Petitioner then claimed in a submission to the Board on May 31, 2018 that it laid off Gonzalez because he "never presented the papers showing he can lawfully work in the United States." J.A. 394. But Trentini admitted that he did not verify employees' work authorization

as a matter of course. Furthermore, Gonzalez told Trentini that he had work authorization when Trentini asked on May 15, 2018. At the hearing before the ALJ, Petitioner again shifted to claiming it laid off Gonzalez because it closed RAV. Substantial evidence supports the Board's finding that Gonzalez's separation was unlawful.

———————

In the next section, we discuss whether the Company's closure of RAV was an unfair labor practice under *Darlington*. We want to make it clear, however, that even if Petitioner did not act unlawfully in closing RAV, Petitioner's challenges to the Board's findings that the Company committed unfair labor practices in its treatment of Gonzalez and Valencia still fail. As we have explained, the Board properly found that the disputed discharge and layoff of these employees reflected impermissible retaliation for their pro-union activities for which appropriate remedies are due.

### D. Closure of RAV

An employer has an absolute right to terminate her or his entire business, even if the closing is motivated by antiunion animus. *See Darlington*, 380 U.S. at 273-74. However, "a partial closing is an unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect." *Id.* at 275.

In *Darlington*, the Supreme Court established the following test regarding partial closures:

If the persons exercising control over a plant that is being closed for antiunion reasons (1) have an interest in another business, whether or not affiliated with or engaged in the same line of commercial activity as the closed plant, of sufficient substantiality to give promise of their reaping a benefit from the discouragement of unionization in that business; (2) act to close their plant with the purpose of producing such a result; and (3) occupy a relationship to the other business which makes it realistically foreseeable that its employees will fear that such business will also be closed down if they persist in organizational activities, we think that an unfair labor practice has been made out.

*Id.* at 275-76. In this case, the Board adopted the ALJ's conclusion that, pursuant to *Darlington*, Petitioner violated sections 8(a)(3) and (1) of the Act by closing the RAV portion of its business.

As we explained in the introduction to this opinion, we are remanding the Board's determination for further explanation because the Board's reasoning does not fully square with the requirements of *Darlington*. It is significant that the ALJ raised very serious concerns regarding the sufficiency of evidence of chilling intent and foreseeability. *See RAV*, 369 N.L.R.B. No. 36, at 13. The ALJ pointed out that "the record lack[ed] certain evidence that is characteristic of other cases in which the Board found violations." *Id.* In particular, the ALJ noted that the Company did not close RAV before Concrete Express's union election on May 10; the General Counsel did not present evidence that Concrete Express employees actually learned of the circumstances surrounding RAV's closure; and, most significantly, "*the record contain[ed] no evidence that [Petitioner] discussed RAV's closure with Concrete Express*

*employees or engaged in other unlawful conduct which might have established a coercive context at Concrete Express more conducive to an inference of chilling intent and foreseeability.*" *Id.* (emphasis added). As a result, the ALJ "perceive[d] [the] case as falling among the more minimal showings of chill within the evidentiary range of Board findings of unlawful partial closures." *Id.*

The ALJ nevertheless found that circumstantial evidence "support[ed] a 'logical inference' that [Petitioner] intended to and could reasonabl[y] foresee the chill of Section 7 activity among Concrete Express employees." *Id.* (quoting *George Lithograph Co.*, 204 N.L.R.B. 431, 431 (1973)). The ALJ observed that at the time of RAV's closure, Petitioner was still contesting in postelection proceedings the Union's victory at Concrete Express; Concrete Express's drivers picked up and dropped off their trucks at Merritt Avenue, and so "would certainly have noticed that the RAV mechanics were separated in the context of an organizing campaign"; and the same Union organized Concrete Express's workers and RAV's workers, at facilities that were in close proximity. *See id.*

The Board never addressed the concerns raised by the ALJ. Instead, the Board merely stated that, in addition to the evidence relied upon by the ALJ, it also relied upon evidence of Petitioner's actions in the *Concrete Express* case "as evidence that [Petitioner's] closure of [RAV] was motivated by a purpose of chilling the protected union activity of its remaining employees at [Concrete Express], and that [Petitioner] would reasonably have foreseen that this closure would have a chilling effect." *Id.* at 1 n.2. This conclusory statement is inadequate. The Board did not address the evidentiary gaps identified by the ALJ. Nor did it explain how the unfair labor practices found in *Concrete Express* supported

a finding of chilling intent and foreseeability with respect to the Company's actions related to RAV.

It is undisputed that the Company lost its lease for the property at 38 Edison Avenue, Mount Vernon, where RAV had been housed; the Company moved into temporary space to finish pending projects, but that space was neither adequate in size nor properly registered under New York law to accommodate a third-party repair shop; and the lease for the temporary location ended on May 31, 2018. It is true the evidence proffered by Petitioner to support its claim that RAV was facing financial difficulties was not strong. Nevertheless, the Company's evidence regarding the loss of the lease covering the space at Edison Avenue stands unrefuted by the General Counsel.

Therefore, the record indicates that the Company closed the RAV operation because it could not exist without the leased space, not because of the Union activities. And there is no evidence that the Company identified a different, suitable location for the RAV operation. This may explain why the ALJ saw the "case as falling among the more minimal showings of chill within the evidentiary range of Board findings of unlawful partial closures." *RAV*, 369 N.L.R.B. No. 36, at 13.

We owe no deference to the Board's conclusion where, as here, "the Board fails to adequately explain its reasoning, [or] where the Board leaves critical gaps in its reasoning." *David Saxe Prods., LLC v. NLRB*, 888 F.3d 1305, 1311 (D.C. Cir. 2018) (alteration in original) (citation omitted). It is possible that the Board will be able to justify a finding that the Company committed an unfair labor practice under *Darlington* when it closed the RAV portion of the business. This remains to be seen, however. Without a better explanation from the Board, we are constrained to remand.

**E. Motion to Reopen the Record**

Petitioner also challenges the Board's denial of its motion to reopen the record to include the signed tax return dated January 14, 2019. The Board did not abuse its discretion in denying Petitioner's motion. As the Board explained, "the document presented in [the Company's motion to reopen the record was] not, in fact, the 'actual signed tax return' requested by [the ALJ] at the hearing, but [was] instead a document signed by [the Company's] owner on January 14, 2019, and created by a different paid tax preparer than the document advanced at the hearing." *RAV*, 369 N.L.R.B. No. 36, at 1 n.1. The Board grants motions to reopen the record only in "extraordinary circumstances." *See* 29 C.F.R. § 102.48(c). Here, Petitioner failed to demonstrate any "extraordinary circumstances."

**F. Remedies**

The Board's remedial power is "a broad discretionary one, subject to limited judicial review." *Fibreboard*, 379 U.S. at 216 (citation omitted). "Our essential task as a reviewing court is to assure ourselves that the Board 'has considered the factors which are relevant to its choice of remedy, selected a course that is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.'" *Traction Wholesale Ctr.*, 216 F.3d at 104 (quoting *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1120 (D.C. Cir. 1994)).

Petitioner objects to the portions of the Board's order requiring it to offer Valencia and Gonzalez reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions; to make Valencia and Gonzalez whole for any loss of earnings or benefits; to bargain

with the Union upon request; and to reopen and restore RAV's business operation as it existed on May 14, 2018.

### 1. *Reinstatement and Make-Whole Remedies for Valencia and Gonzalez*

As explained above, substantial evidence supports the Board's conclusion that Petitioner committed unfair labor practices by discharging Valencia and laying off Gonzalez due to their protected activity. We therefore have no difficulty enforcing the reinstatement and make-whole remedies. Petitioner argues the reinstatement and make-whole remedies are unduly economically burdensome because Petitioner no longer performs mechanical work for third parties and there is insufficient work on Concrete Express's trucks alone to employ two mechanics. These challenges can be addressed at compliance proceedings. *See Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1330 (D.C. Cir. 2012) ("[I]t is well-established that 'compliance proceedings provide the appropriate forum' to consider objections to the relief ordered." (first quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984); and then citing *Ark Las Vegas*, 334 F.3d at 107)).

Petitioner also objects to a portion of the ALJ's decision that speculates that restoration of RAV's operation would require Petitioner to hire two mechanics, even if Valencia could not be rehired due to his immigration status. Because we remand the restoration remedy, we leave it to the Board to consider this matter on remand.

### 2. *Bargaining Order Remedy*

The Board must determine on remand whether a unit of mechanics formerly employed by Petitioner at 3773 Merritt Avenue still exists, apart from Concrete Express, in a form that

makes a bargaining order under the NLRA feasible. If the unit exists as a distinct entity, so as to be amenable to a bargaining order from the Board, then we find that the Board provided sufficient justification for the bargaining order.

The Board may issue remedial bargaining orders where an employer has committed violations that "have the tendency to undermine majority strength and impede the election processes." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614 (1969). The Board must balance "(1) the employees' § 7 rights [to a representative of their own choosing]; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act." *Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 826-27 (D.C. Cir. 2001) (alteration in original) (citation omitted). As the Board explained, the first two factors weigh in favor of a bargaining order here because Valencia and Gonzalez both signed union authorization cards. As for the third, the Board reasonably concluded that traditional remedies, such as reinstatement and backpay, would not adequately remedy Petitioner's violations. *See Bristol Indus. Corp.*, 366 N.L.R.B. No. 101, at 3, 2018 WL 2761561, at *2 (June 7, 2018) ("A bargaining order is particularly appropriate where, as here, an employer has reacted to the first hint of a union campaign by terminating the entire bargaining unit." (citation and internal quotation marks omitted)). Petitioner's arguments opposing the bargaining order – that it had no choice but to fire Valencia and that Gonzalez was the casualty of an unprofitable business – only rehash the merits of its case.

### 3. Restoration Order Remedy

The Board ordered Petitioner to "reopen and restore the business operation of [RAV] as it existed on May 14, 2018."

*RAV*, 369 N.L.R.B. No. 36, at 1. We remand this portion of the Board's order because the Board's judgment defies reasoned decision making. The Board's decision fails to properly consider whether its restoration order is legally permissible, feasible, necessary, or unduly burdensome, as the law requires. The following considerations cause us to remand this matter to the Board for further consideration.

First, in part D, we explain why the Board's decision that the Company committed an unfair labor practice when it shut down the RAV operation must be remanded for reconsideration. If, on remand, the Board finds that the Company did not commit an unfair labor practice under *Darlington*, then, of course, no restoration remedy is due.

Second, if the Board finds that the Company's closure of RAV did violate the partial closing rule of *Darlington*, there is still a question as to whether a restoration remedy is appropriate. The principal problem is that the Board's restoration order is impossible to comprehend on the record at hand. We cannot even discern from the record in this case whether restoration is "factually possible." *Douglas Foods Corp.*, 251 F.3d at 1064. The Board's order requires restoration of RAV "as it existed on May 14, 2018." But the Company had no lawful, suitable location in which to house the RAV operation on May 14. And the Board has failed to cite any authority to support the legal legitimacy of an order that purports to compel a company to "reopen" an operation that no longer exists due to the loss of a lease and for which there is no adequate space to house the operation within the existing company facilities.

Third, a NLRB order requiring a company to restore an operation pursuant to *Darlington* typically will be upheld only when the operation can be accommodated within the

company's existing business and the restoration order is not unduly burdensome. *Decisions rejecting restoration orders: see, e.g.*, *G & T Terminal Packaging Co.*, 246 F.3d at 121-22 (holding restoration order to be unduly burdensome because company did not have enough space to accommodate the disputed work operation); *Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 797 (4th Cir. 1998) (vacating restoration order because the company could not "simply restor[e] the prior operation but [rather would] be obliged to create an entirely restructured department"); *Douglas Foods Corp.*, 251 F.3d at 1064-65 (vacating restoration order where Board gave no "explanation of its authority to enter such order or [the company's] ability to carry it out," and where order seemed to require "forced repurchase of independently owned assets"). *Decisions upholding restoration orders: see, e.g.*, *Vico Prods. Co. v. NLRB*, 333 F.3d 198, 213 (D.C. Cir. 2003) (upholding restoration order where employer continued to occupy closed facility and had not shown that resuming operations would be unfeasible); *O'Dovero v. NLRB*, 193 F.3d 532, 538-539 (D.C. Cir. 1999) (upholding restoration order where owner testified that it could reopen closed operations "tomorrow" and the Board found that reopening would "impose[] no significant operational costs"). *Board decisions: see, e.g.*, *Int'l Shipping Agency, Inc.*, 369 N.L.R.B. No. 79, at 7, 2020 WL 2615492, at *8 (May 20, 2020) (finding restoration order "not appropriate" because "a return to the status quo ante . . . would be unduly burdensome"); *Chariot Marine Fabricators & Indus. Corp.*, 335 N.L.R.B. 339, 357 (2001) (finding restoration order unduly burdensome in part because employer "would be required to find and lease new premises, which might prove difficult in [the] small community" where employer was located); *Nat'l Fam. Op., Inc.*, 246 N.L.R.B. 521, 521 (1979) (holding that reestablishment of printing department would be unduly burdensome where restoration would require either transfer of entire department or leasing of additional space); *Burroughs*

*Corp.*, 214 N.L.R.B. 571, 571 (1974) (declining to impose restoration remedy where reopening would require employer "to extend or renew an expiring lease"); *Plastics Transp., Inc.*, 193 N.L.R.B. 54, 54, 59 (1971) (adopting restoration order where employer continued to lease facility and reopening "would entail no additional financial outlay other than the institution of some form of supervision"). In this case, the Board did not properly consider whether its order to restore the RAV auto repair shop would be legally permissible, necessary, or unduly burdensome.

Fourth, the Board also failed to address Petitioner's compelling and uncontradicted evidence that it had no suitable space in which to operate the RAV auto repair shop once the lease for the Edison Avenue location was terminated. Trentini testified that, in February 2018, RAV lost its lease at Edison Avenue, which was a registered third-party repair shop. The Company temporarily leased 3773 Merritt to complete unfinished work projects, but that lease ended on May 31, 2018. Furthermore, the record indicates that the temporary space was both undersized and lacked several features required by New York law for third-party repair shops, such as sprinklers, fire alarms, standpipes, and oil and water separators. Petitioner submitted the relevant New York regulations to the ALJ. The Board's General Counsel did not rebut this evidence and the ALJ did not find that Trentini lacked credibility on these points. Therefore, RAV could not simply be "restored" in existing Company space. The Board never addressed this consideration, unless we are to assume that the Board's order was meant to require the Company to continue operating unlawfully in substandard space at the 3773 Merritt Avenue location. We doubt that is what the Board meant to say. However, the absence of reasoned decision making makes it impossible for us to understand the Board's decision on these matters.

We do not question the validity of restoration orders in appropriate circumstances, but, as with any remedial order, the Board must justify its action. *See Sullivan Indus. v. NLRB*, 957 F.2d 890, 904-05 (D.C. Cir. 1992). The Board has completely failed to do so in this case.

## III. CONCLUSION

For the foregoing reasons, we deny the petition for review with respect to the Board's determination that Petitioner committed unfair labor practices by terminating Valencia and laying off Gonzalez. We also enforce the Board's proposed remedies, other than the restoration order and the bargaining order. We remand the issues of RAV's closure and the restoration order so that the Board may address the matters raised in this opinion regarding those issues. The Board must also determine on remand whether a unit of mechanics formerly employed by Petitioner at 3773 Merritt Avenue still exists, apart from Concrete Express, in a form that makes a bargaining order under the NLRA feasible.